## WOOLDRIDGE v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. December 4, 1916.)

No. 2839.

CRIMINAL LAW ⚖==44—"ATTEMPT"—ELEMENTS OF OFFENSE.

To constitute an indictable offense under Comp. Laws Alaska 1913, § 2073, making it a punishable offense "if any person attempts to commit any crime and in such attempt does any act toward the commission of such crime but fails or is prevented or intercepted," there must have been an intent to commit the specific crime, and in addition an overt act toward its commission.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 51; Dec. Dig. ⚖==44.

For other definitions, see Words and Phrases, First and Second Series, Attempt.]

In Error to the District Court of the United States for the Fourth Division of the Territory of Alaska; Charles E. Bunnell, Judge.

Criminal prosecution by the United States against W. H. Wooldridge. Judgment of conviction, and defendant brings error. Reversed.

James J. Crossley, of Portland, Or., and Bion A. Dodge and T. A. Marquam, both of Fairbanks, Alaska, for plaintiff in error.

R. F. Roth, U. S. Atty., of Fairbanks, Alaska, and John W. Preston, U. S. Atty., and Casper A. Ornbaun, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

HUNT, Circuit Judge. W. H. Wooldridge, called defendant, was indicted in Alaska on February 18, 1916, on two counts: One for statutory rape, alleged to have been committed December 23, 1914; and another for an attempt to commit rape on February 14, 1916, upon Laura Herrington, a girl under 16 years of age. Wooldridge was acquitted on the first count, but convicted of an attempt to commit rape as charged in the second count. Writ of error brings the case to this court.

The particular charge against Wooldridge was that he procured Laura Herrington to consent to meet him in a certain place known as "Rose's Repair Shop," in Fairbanks, Alaska, for the purpose of having sexual intercourse, and that he met her at the shop pursuant to arrangement, and with the intent to carry out the plan to know her carnally, but that he was prevented and intercepted in the execution of his purpose.

⚖==For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Section 1894 of the Compiled Laws of Alaska provides that whoever has carnal knowledge of a female person forcibly and against her will, or, being 16 years of age, carnally knows and abuses a female person under 16 years of age, with her consent, is guilty of rape. Section 2073, Compiled Laws of Alaska, is as follows:

"That if any person attempts to commit any crime, and in such attempt does any act toward the commission of such crime, but fails, or is prevented or intercepted in the perpetration thereof, such person, when no other provision is made by law for the punishment of such attempt, upon conviction thereof, shall be punished as follows," etc.

The most important question presented by defendant is whether the evidence will sustain the verdict and judgment. It is not necessary to state more of the testimony than may serve to demonstrate the material point in the case. The direct evidence of the prosecutrix herself was that she made arrangements with the officials in the United States marshal's office whereby she was to make an appointment with the defendant; that she made such an appointment with him at the request of Miller, a deputy United States marshal; that she was encouraged in making this "date" with Wooldridge by her father, who told her, if she could make the "date" with Wooldridge, to make it; that she made an appointment to meet Wooldridge at Rose's Repair Shop in the evening; that she went into the repair shop and was greeted by a man named Rose; that Rose was in the back room lying on the bed, and Wooldridge was sitting by him; that Wooldridge got up, buttoned his coat, and went into another room; that she stayed in the back room; that in a little while Rose went into the other room, and, after whispering with Wooldridge, Wooldridge came back and told her to turn out the lights and to stay there until they came back; that Rose returned, and told her to go away, as somebody was watching; that she went into the other room and stayed there, because the officers came in, and that then they went up to the marshal's office; that Wooldridge did not touch her, or lay his hands upon her; that she had been instructed by some of the United States officials, or her father, to talk loud when she was in there, and that she asked Wooldridge why he wanted her to turn out the light. On cross-examination she said that, just before she went to Rose's shop, she talked with Marshal Miller, who instructed her to talk loud at the meeting to be had; that she understood some of the marshals would be around somewhere. She also said that she was alone in the back room with the light out, the men being in the other room; that, when Wooldridge told her to turn out the light, he said he did not wish people to see her in there; that she was going to the front door to go out when the marshals came in.

J. P. Rose, proprietor of the shop where the prosecutrix was at the time of the alleged attempted rape, was called by the government. He testified concerning Wooldridge's movements and conversations before the girl came in, and said that he did not remember everything that was said by Wooldridge when the girl came into the shop. He was asked if he had not made a sworn statement in the marshal's office upon the night of the occurrences testified to by the prosecuting

witness. He said he had. Witness was then asked concerning the statements made and incorporated in the statement, and also concerning testimony he had given before the grand jury. In part of this examination, really a cross-examination by the counsel for the government, Rose was asked if he had not stated that the girl had come into his place after Wooldridge had told him (Rose) that he desired to have sexual intercourse with her. The witness denied that he had made such a statement. The government then introduced a statement, made directly after the meeting at Rose's place, subscribed and sworn to by Rose, wherein Rose had said, among other things, that Wooldridge talked with the girl in the back room for a few seconds, and then came out of the back room, and that the girl then turned out the light; that Wooldridge had told him that he desired to have intercourse with the girl, and that Rose told him not to have anything to do with her until the grand jury got through; that it would not be safe, and that the girl would be taken up to the prosecuting attorney's office, and then back to the grand jury room, and that they would "sweat her until she would have to tell it." Rose also said in this statement that, when he went back into the house, he (Rose) told the girl to come out, as somebody was watching her; that he recognized the men who were watching, and that he went back and got the girl. On cross-examination, witness stated he had not written or dictated the statement; that he did not think he ever said Wooldridge spoke of having intercourse with the girl.

Defendant testified in substance that he often called at Rose's shop; that upon the evening in question he found a light burning in the front and back rooms; that Rose was lying on the bed in the back room reading; that at Rose's request he turned off the light in the front room; that he stayed at Rose's for a few minutes, and talked with Rose, who was lying down in the back room; that at about 8 o'clock Laura Herrington came in and told him that somebody was following her, and that she wanted to hide; that he got up at once and went to the front door, to see who was following the girl; that he turned the light on in the front room and walked out; that Rose followed him; that at Rose's direction he himself walked back to within 15 feet, where he could see the girl, and told her that Rose said to turn the light out if she wanted to hide; that she said she would walk farther back; that he stepped to the front door, Rose following, and that Rose put out the light in the front room as they passed out; that he saw two men near a corner, and that he went up the street to see who the men were; that he met two men he knew and went back to Rose's store with them; that Rose and others, some of whom were deputy marshals, were at the store; that they then went to the marshal's office, where he met Rose and the girl.

The evidence discloses that for the purpose of procuring evidence, if they could, against Wooldridge, the marshal and his deputies, after conference with the United States attorney, formed a plan to detect Wooldridge and the girl alone together. In the pursuit of this plan a number of deputy marshals were placed in and about Rose's premises, in order to see and hear what took place at the prearranged meeting referred to.

George Berg, a deputy marshal, was at Rose's shop. He saw Rose on the bed. He could not hear all that was said between Rose and Wooldridge, but heard conversation about a picture show. Witness said Wooldridge and Rose whispered, and that Wooldridge spoke of having intercourse with the girl; that Rose advised him not to, as the grand jury would make trouble; that the two men left the room, leaving the girl, who turned the light out; that he heard some one call the girl out; and that very soon after that they all went to the marshal's office.

J. H. Miller, chief deputy marshal for Alaska, said that he and his assistants had arranged to go down to Rose's to see the meeting and overhear the conversation between Laura Herrington and Woolridge. After describing the preliminary arrangements, the marshal said that he told the girl that, if anything happened that was not right, "or if he attempted to treat her wrong in any way," she was to say, "Now, you be careful," or "Be careful," or words to that effect, and then something would occur that would cause a stop. Witness, however, did not go into Rose's shop that night, and the next thing within his knowledge was when Wooldridge and Rose and the girl were told to come up to his office. On cross-examination the marshal said the initial purpose of going to Rose's shop was to prove by the conversation to be had between Wooldridge and the girl whether the crime she alleged against him "had actually happened up in that cabin." Witness explained that, if it developed that something would aid the prosecution, well and good, or if it developed that something would aid the defendant, well and good; that it made no difference to him.

Examination of the books shows that the word "attempt" generally means the trial or physical effort to do a particular thing. In 1 Bishop's Criminal Law, § 511, the author says:

"When we say that a man attempted to do a thing, we mean that he intended to do, specifically, it, and proceeded a certain way in the doing. The intent in the mind covers the thing in full; the act covers it only in part."

In State v. Martin, 14 N. C. 329, the court said:

"Attempt is expressive rather of a moving towards doing the thing, than of the purpose itself. An attempt is an overt act itself." Rex v. Higgins, 2 East, 5.

In State v. Taylor, 47 Or. 455, 84 Pac. 82, 4 L. R. A. (N. S.) 417, 8 Ann. Cas. 627, the court considered the meaning of a statute in exactly the same language as the one under which this defendant was tried. The court quoted Bishop's New Criminal Law, § 728, which defines an attempt as an intent to do a particular criminal thing, with an act toward it falling short of the thing intended, and Wharton's Criminal Law (9th Ed.) § 173, which defines an attempt to be an intended apparent unfinished crime. The court deduced from the authorities the rule that an indictable attempt consists of an intent to commit a crime, and a direct, ineffectual act done toward its commission, and said:

"To constitute an attempt, there must be something more than a mere intention to commit the offense, and preparation for its commission is not sufficient. Some overt act must be done toward its commission, but which falls

short of the completed crime. It need not be the last proximate act before the consummation of the offense, but it must be some act directed toward the commission of the offense after the preparations are made."

To like effect are the following cases: Patrick v. People, 132 Ill. 529, 24 N. E. 619; State v. Lung, 21 Nev. 209, 28 Pac. 235, 37 Am. St. Rep. 505; Stabler v. Commonwealth, 95 Pa. 318; Hicks v. Commonwealth, 86 Va. 223, 9 S. E. 1024, 19 Am. St. Rep. 891; People v. Gardner, 144 N. Y. 119, 38 N. E. 1003, 28 L. R. A. 699, 43 Am. St. Rep. 741; People v. Sullivan, 173 N. Y. 122, 65 N. E. 989, 63 L. R. A. 353, 93 Am. St. Rep. 582; McDermott v. People, 5 Parker, Cr. R. (N. Y.) 102.

In State v. Charley Lung, 21 Nev. 210, 28 Pac. 235, 37 Am. St. Rep. 505, where defendant was charged with an attempt to commit rape, the court held that, not only was the intention to commit the rape necessary, but there must have been some act done in connection with such intent, constituting the attempt, and regarded it as essential that the act of endeavor should be intrinsically adapted to effect the purpose, and that the court and accused may see that it is so adapted, it should be specifically stated in the indictment.

In Stabler v. Commonwealth, 95 Pa. 318, 40 Am. Rep. 653, the court held that there must be some act committed as well as an intent to have carnal knowledge.

McDermott v. People, 5 Parker, Cr. R. (N. Y.) 102, was an indictment for an attempt to set fire to and burn a certain barn. The court held that two important and essential facts were intent to commit the offense, and some overt act consequent upon that intent toward its commission, and that so long as the act rests in bare intention, it is not punishable.

McClain on Criminal Law (1897) vol. 1, § 222, interprets the authorities as holding that, to constitute an attempt, there must be the intent to commit a crime and some act done toward its consummation, and that the term "attempt" signifies both an act and the intent with which it is done.

In the light of these and many other cases that might be cited, it must be held that there was a failure of proof with respect to the doing of an overt act toward the commission of the crime charged. The undisputed evidence of the occurrences at Rose's store is that no act was done by Wooldridge toward the commission of the crime, and although it may have been his intention when he went to the store to have intercourse with the girl, in the absence of evidence of an attempt to carry out such purpose, there could be no conviction of an attempted rape.

The judgment is reversed.