**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roy MANDUJANO, Defendant-
Appellant.**

**No. 74–1445.**

United States Court of Appeals,
Fifth Circuit.

Aug. 19, 1974.

Rehearing Denied Sept. 17, 1974.

Michael Allen Peters, Houston, Tex. (Court-appointed), for defendant-appellant.

William S. Sessions, U. S. Atty., John M. Pinckney, III, Asst. U. S. Atty., San Antonio, Tex., Ron Ederer, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, and RIVES and DYER, Circuit Judges.

RIVES, Circuit Judge:

Mandujano appeals from the judgment of conviction and fifteen-year sentence imposed by the district court, based upon the jury's verdict finding him guilty of attempted distribution of heroin in violation of 21 U.S.C. § 846.[1] We affirm.

I.

The government's case rested almost entirely upon the testimony of Alfonso H. Cavalier, Jr., a San Antonio police officer assigned to the Office of Drug Abuse Law Enforcement. Agent Cavalier testified that, at the time the case arose, he was working in an undercover capacity and represented himself as a narcotics trafficker. At about 1:30 P. M. on the afternoon of March 29, 1973, pursuant to information Cavalier had received, he and a government informer went to the Tally-Ho Lounge, a bar located on Guadalupe Street in San Antonio. Once inside the bar, the informant introduced Cavalier to Roy Mandujano. After some general conversation, Mandujano asked the informant if he was looking for "stuff." Cavalier said, "Yes." Mandujano then questioned Cavalier about his involvement in narcotics. Cavalier answered Mandujano's questions, and told Mandujano he was looking for an ounce sample of heroin to determine the quality of the material. Mandujano replied that he had good brown Mexican heroin for $650.00 an ounce, but that if Cavalier wanted any of it he would have to wait until later in the afternoon when the regular man made his deliveries. Cavalier said that he was from out of town and did not want to wait that long. Mandujano offered to locate another source, and made four telephone calls in an apparent effort to do so. The phone calls appeared to be unsuccessful, for Mandujano told Cavalier he wasn't having any luck contacting anybody. Cavalier stated that he could not wait any longer. Then Mandujano said he had a good contact, a man who kept narcotics around his home, but that if he went to see this man, he would need the money "out front." To reassure Cavalier that he would not simply abscond with the money, Mandujano stated, "[Y]ou are in my place of business. My wife is here. You can sit with my wife. I am not going to jeopardize her or my business for $650.00." Cavalier counted out $650.00 to Mandujano, and Mandujano

---

**1.** Count One of the indictment charged:

"On or about the 29th day of March, 1973, in the Western District of Texas, ROY MANDUJANO, the defendant herein, did knowingly and intentionally attempt to distribute one ounce of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1), all in violation of Title 21, United States Code, Section 846."

Count Two of the same indictment charged perjury before the Grand Jury. That count has been separately considered by the district court, 365 F.Supp. 155, and by this Court, 5th Cir. 1974, 496 F.2d 1050.

left the premises of the Tally-Ho Lounge at about 3:30 P.M. About an hour later, he returned and explained that he had been unable to locate his contact. He gave back the $650.00 and told Cavalier he could still wait until the regular man came around. Cavalier left, but arranged to call back at 6:00 P.M. When Cavalier called at 6:00 and again at 6:30, he was told that Mandujano was not available. Cavalier testified that he did not later attempt to contact Mandujano, because, "Based on the information that I had received, it would be unsafe for either my informant or myself to return to this area."

The only other government witness was Gerald Courtney, a Special Agent for the Drug Enforcement Administration. Agent Courtney testified that, as part of a surveillance team in the vicinity of the Tally-Ho Lounge on March 29, 1973, he had observed Mandujano leave the bar around 3:15 or 3:30 P.M. and drive off in his automobile. The surveillance team followed Mandujano but lost him almost immediately in heavy traffic. Courtney testified that Mandujano returned to the bar at about 4:30 P.M.

## II.

Section 846 of Title 21, entitled "Attempt and conspiracy," provides that,

"Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

The theory of the government in this case is straightforward: Mandujano's acts constituted an attempt to distribute heroin; actual distribution of heroin would violate section 841(a)(1) of Title 21;[2] therefore, Mandujano's attempt to distribute heroin comes within the terms of section 846 as an attempt to commit an offense defined in the subchapter.

Mandujano urges that his conduct as described by agent Cavalier did not rise to the level of an attempt to distribute heroin under section 846. He claims that at most he was attempting to acquire a controlled substance, not to distribute it; that it is impossible for a person to attempt to distribute heroin which he does not possess or control;[3] that his acts were only preparation, as distinguished from an attempt; and that the evidence was insufficient to support the jury's verdict.

Apparently there is no legislative history indicating exactly what Congress meant when it used the word "attempt" in section 846.[4] There are two reported federal cases which discuss the question of what constitutes an attempt under this section. In United States v. Noreikis, 7 Cir. 1973, 481 F.2d 1177, where

2. "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 "(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."
Tit. 21, U.S.C. § 841(a)(1).
 Under subsection 802(11) the term "distribute" means "to deliver (other than by administering or dispensing) a controlled substance." Subsection 802(8) defines the terms "deliver" or "delivery" to mean "the actual, constructive or attempted transfer of a controlled substance, whether or not there exists an agency relationship."

3. In opening argument, the United States Attorney stated: "There is a stipulation that has been entered into by the Government

stating categorically that no heroin exchanged hands in this case * * *."
(Tr. 16) During the cross-examination of Cavalier, the court asked Mandujano's attorney if he agreed with the stipulation as stated in the opening argument. Mandujano's attorney replied, "Yes, sir, in general that was the stipulation Your Honor." (Tr. 53)

4. House Report No. 91–1444 on the Drug Control Act simply states that "Section 406 provides that any person who attempts or conspires to commit any offense defined in this title may be punished by imprisonment and/or fine which may not exceed the maximum amount set for the offense, the commission of which was the object of the attempt or conspiracy." 1970 U.S.Code Cong. & Admin.News, ps. 4566, 4617.

the defendants possessed the various chemicals necessary to synthesize Dimethyltryptamine (DMT), a controlled substance, the court held that the preparations had progressed to the level of an attempt to manufacture a controlled substance. In its discussion, the court commented that,

> "While it seems to be well settled that mere preparation is not sufficient to constitute an attempt to commit a crime, 22 C.J.S. Criminal Law § 75(2)b, at 230 et seq., it seems equally clear that the semantical distinction between preparation and attempt is one incapable of being formulated in a hard and fast rule. The procuring of the instrument of the crime might be preparation in one factual situation and not in another. The matter is sometimes equated with the commission of an overt act, the 'doing something directly moving toward, and bringing him nearer, the crime he intends to commit.' 22 C.J.S., *supra* at 231."

481 F.2d at 1181.

In United States v. Heng Awkak Roman, S.D.N.Y.1973, 356 F.Supp. 434, aff'd, 2 Cir. 1973, 484 F.2d 1271, where the defendants' actions would have constituted possession of heroin with intent to distribute in violation of section 841 if federal agents had not substituted soap powder for the heroin involved in the case, the court held that the defendants' acts were an attempt to possess with intent to distribute. The district court in its opinion acknowledged that " 'Attempt,' as used in section 846, is not defined. Indeed, there is no comprehensive statutory definition of attempt in federal law." The court concluded, however, that it was not necessary in the circumstances of the case to deal with the "complex question of when conduct crosses the line between 'mere preparation' and 'attempt.' " 356 F.Supp. at 437.

The courts in many jurisdictions have tried to elaborate on the distinction between mere preparation and attempt. See the Comment at 39–48 of Tent. Draft No. 10, 1960 of the Model Penal Code.[5] In cases involving statutes other than section 846, the federal courts have confronted this issue on a number of occasions.

Wooldridge v. United States, 9 Cir. 1916, 237 F. 775, involved a conviction for an attempted rape prosecuted under a general criminal attempt provision of the Alaska code. The court reviewed the state authorities and several treatises and then opined as follows:

> "In light of these and many other cases that might be cited, it must be held that there was a failure of proof with respect to the doing of an overt act toward the commission of the crime charged. The undisputed evidence of the occurrences at Rose's store is that no act was done by Wooldridge toward the commission of

---

5. This comment to the Model Penal Code catalogues a number of formulations which have been adopted or suggested, including the following:

(a) The physical proximity doctrine—the overt act required for an attempt must be proximate to the completed crime, or directly tending toward the completion of the crime, or must amount to the commencement of the consummation.

(b) The dangerous proximity doctrine—a test given impetus by Mr. Justice Holmes whereby the greater the gravity and probability of the offense, and the nearer the act to the crime, the stronger is the case for calling the act an attempt.

(c) The indispensable element test—a variation of the proximity tests which emphasizes any indispensable aspect of the criminal endeavor over which the actor has not yet acquired control.

(d) The probable desistance test—the conduct constitutes an attempt if, in the ordinary and natural course of events, without interruption from an outside source, it will result in the crime intended.

(e) The abnormal step approach—an attempt is a step toward crime which goes beyond the point where the normal citizen would think better of his conduct and desist.

(f) The res ipsa loquitur or unequivocality test—an attempt is committed when the actor's conduct manifests an intent to commit a crime.

the crime, and although it may have been his intention when he went to the store to have intercourse with the girl, in the absence of evidence of an attempt to carry out such purpose, there could be no conviction of an attempted rape."

237 F. at 779. Thus, the court indicated that an attempt requires an intent to commit the specific crime and, in addition, an overt act toward its commission. A more recent Ninth Circuit opinion uses language similar to that used in *Wooldridge*: In Lemke v. United States, 9 Cir. 1954, 211 F.2d 73, 75, 14 Alaska 587, the court states, "Of course it is elementary that mere preparation to commit a crime, not followed by an overt act done toward its commission, does not constitute an attempt." The definition of attempt in United States v. Baker, S. D.Cal.1955, 129 F.Supp. 684, 685, is also consistent with the language of Wooldridge: "The classical legal elements of an 'attempt' are the *intent* to commit a crime, the execution of some overt *act* in pursuance of the intention, and a *failure to consummate* the crime." Also see Giles v. United States, 9 Cir. 1946, 157 F.2d 588, 590, where the court found no error in the following jury instruction: " 'An attempt is an act tending toward the accomplishment, and done in part execution of the design to commit a crime, exceeding an intent but falling short of an execution of it.' "

United States v. De Bolt, S.D. Ohio 1918, 253 F. 78, involved an apparent attempt to sabotage the manufacture of war materials in violation of federal law. With regard to the elements of an attempt, the court in this case quoted Bishop's New Crim. Law (1892) vol. 1, §§ 728, 729:

" 'An attempt is an intent to do a particular criminal thing, with an act toward it falling short of the thing intended. Hence, the two elements of an evil intent and a simultaneous resulting act constitute, and yet only in combination, an indictable offense, the same as in any other crime.' "

The court also cited Wooldridge v. United States, *supra*, and United States v. Quincy, 1832, 31 U.S. (6 Pet.) 445, 8 L. Ed. 458, discussed *infra*.

Gregg v. United States, 8 Cir. 1940, 113 F.2d 687, involved in part a conviction for an attempt to import intoxicating liquor into Kansas. The court in this case acknowledges with apparent approval the definition of attempt urged by appellant Gregg:

"He calls attention to the fact that an attempt is an endeavor to do an act carried beyond mere preparation, but falling short of execution, and that it must be a step in the direct movement towards the commission of the crime after preparations have been made. People v. Collins, 234 N.Y. 355, 137 N.E. 753. The act must 'carry the project forward within dangerous proximity to the criminal end to be attained.' Cardozo, J., in People v. Werblow, 241 N.Y. 55, 148 N.E. 786, 789; People v. Rizzo, 246 N.Y 334, 158 N.E. 888, 55 A.L.R. 711; People v. Miller, 2 Cal.2d 527, 42 P.2d 308, 98 A.L.R. 913; State v. McCarthy, 115 Kan. 583, 224 P. 44; State v. Davis, 319 Mo. 1222, 6 S.W 2d 609; Commonwealth v. Peaslee, 177 Mass. 267, 59 N.E. 55; Wooldridge v. United States, 9 Cir., 237 F. 775."

113 F.2d at 690. The court held, however, that Gregg's conduct went beyond "mere preparation":

"The transportation of goods into a state is essentially a continuing act not confined in its scope to the single instant of passage across a territorial boundary. In our view the appellant advanced beyond the stage of mere preparation when he loaded the liquor into his car and began his journey toward Kansas. From that moment he was engaged in an attempt to transport liquor into Kansas within the clear intent of the statute."

113 F.2d at 691. Also see United States v. Duane, D.Neb 1946, 66 F.Supp. 459.

In United States v. Coplon, 2 Cir. 1950, 185 F.2d 629, where the defendant

was arrested before passing to a citizen of a foreign nation classified government documents contained in defendant's purse, Judge Learned Hand surveyed the law and addressed the issue of what would constitute an attempt:

"Because the arrest in this way interrupted the consummation of the crime one point upon the appeal is that her conduct still remained in the zone of 'preparation,' and that the evidence did not prove an 'attempt.' This argument it will be most convenient to answer at the outset. A neat doctrine by which to test when a person, intending to commit a crime which he fails to carry out, has 'attempted' to commit it, would be that he has done all that it is within his power to do, but has been prevented by intervention from outside; in short, that he has passed beyond any *locus poenitentiae.* Apparently that was the original notion, and may still be law in England; but it is certainly not now generally the law in the United States, for there are many decisions which hold that the accused has passed beyond 'preparation,' although he has been interrupted before he has taken the last of his intended steps. The decisions are too numerous to cite, and would not help much anyway, for there is, and obviously can be, no definite line; but Judge Cullen's discussion in People v. Sullivan,[1] and Mr.

"1. 173 N.Y. 122, 133–136, 65 N.E. 989, 63 L. R.A. 353.

Justice Holmes' in two Massachusetts decisions,[2] are particularly enlighten-

"2. Commonwealth v. Kennedy, 170 Mass. 18, 20, 22, 48 N.E. 770; Commonwealth v. Peaslee, 177 Mass. 267, 272, 59 N.E. 55, 56.

ing. In the second of the Massachusetts opinions Holmes, J., said: "Preparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a misdemeanor, although there is still a lo-

cus poenitentiae, in the need of a further exertion of the will to complete the crime.' We have found scarcely any decisions of federal courts, but, so far as they go, they are in accord.[3]

"3. Wooldridge v. United States, 9 Cir., 237 F. 775; Gregg v. United States, 8 Cir., 113 F.2d 687; United States v. Duane, D.C., 66 F.Supp. 459, 464, 465.

There can be no doubt in the case at bar that 'preparation' had become 'attempt.' The jury were free to find that the packet was to be delivered that night, as soon as they both thought it safe to do so. To divide 'attempt' from 'preparation' by the very instant of consummation would be to revert to the old doctrine."

185 F.2d at 632, 633. Also see United States v. Butler, S.D N.Y.1962, 204 F. Supp. 339, 343, where the court considered "whether the conduct of the defendant went sufficiently far towards the commission of the crime to constitute an attempt or whether it merely constituted preparation."

In United States v. Robles, N.D.Cal. 1960, 185 F.Supp. 82, 85, a case in which the defendant was charged with using communication facilities in attempting to import heroin illegally, the court enunciated the following test:

"The language of Title 18 U.S.C. § 1403 is such as to compel a conclusion that an attempt may be made by the mere use of communication facilities. To attempt to do an act does not imply a completion of the act, or in fact any definite progress towards it. Any effort or endeavor to effect the act will satisfy the terms of the law. United States v. Quincy, 6 Pet. 445, 31 U.S 445, 8 L.Ed. 458; and see: United States v. Russell, 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed. 553; and Simpson v. United States, 9 Cir., 195 F.2d 721, 13 Alaska 635."

The language used in *Robles, supra,* is drawn directly from United States v. Quincy, 1832, 31 U.S. (6 Pet.) 445, at 464, 8 L.Ed. 458, which involved an indictment under a statute which made it unlawful to attempt to fit out and arm a

vessel with intent to employ her in the service of a foreign people. The Supreme Court in *Quincy* further stated that, "The offence consists principally in the intention with which the preparations were made . . . . And this must be a fixed intention . . . . This intention is a question belonging exclusively to the jury to decide It is the material point on which the legality or criminality of the act must turn." 31 U.S. (6 Pet.) at 466, 8 L.Ed. 458.

In Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 148, we noted that, "Much ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparations ends [sic] and attempt begins," and that the question had not been decided by this Court. The Court in *Mims*, at 148 n. 40, did note that the following test from People v. Buffum, 40 Cal.2d 709, 256 P.2d 317, 321, has been "frequently approved":

> " 'Preparation alone is not enough, there must be some *appreciable fragment* of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, and the act must not be equivocal in nature. * * *' (Emphasis added.)"

■ Although the foregoing cases give somewhat varying verbal formulations, careful examination reveals fundamental agreement about what conduct will constitute a criminal attempt. First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting. United States v Quincy, *supra*, 31 U.S. (6 Pet.) at 466, 8 L.Ed. 458 ("The offence consists principally in the intention with which the preparations were made"); Wooldridge v. United States, *supra*, 237 F. at 779 ("although it may have been his intention"); United States v. Baker, *supra*, 129 F.Supp. at 685 ("the *intent* to commit a crime"); Giles v. United States, *supra*, 157 F.2d at 590 ("the design to commit a

crime"); United States v. Coplon, *supra*, 185 F.2d at 633 ("the *intent* to complete [the crime] renders the crime so probable that the act will be a misdemeanor, although there is still a locus poenitentiae, in the need of a further exertion of the will to complete the crime" [emphasis added]); United States v. Noreikis, *supra*, 481 F.2d at 1181 (" 'the crime he *intends* to commit' " [emphasis added]); United States v. Heng Awkak Roman, *supra*, 356 F.Supp at 437 n. 5 ("There is no doubt here, and I so find, that the defendants had the requisite mens rea; that is, that their actions were knowing and intentional, and with the purpose of distributing the heroin."); People v. Buffum, *supra* ("the will of the attempter").

■ Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent. Wooldridge v. United States, *supra*, 237 F. at 779 ("an overt act toward the commission of the crime charged"); Lemke v. United States, *supra*, 211 F.2d at 75 ("an overt act done toward its [the crime's] commission"); United States v. Baker, *supra* ("some overt act in pursuance of the intention"); Giles v. United States, *supra* ("an act tending toward the accomplishment, and done in part execution of the design to commit a crime"); Gregg v. United States, *supra*, 113 F.2d at 690 ("a step in the direct movement towards the commission of the crime after preparations have been made"); United States v. Coplon, *supra*, 185 F.2d at 633 ("there are many decisions which hold that the accused has passed beyond 'preparation,' although he has been interrupted before he has taken the last of his intended steps . . . there is, and obviously can be, no definite line"); United States v. Robles, *supra* 185 F. Supp. at 85 ("Any effort or endeavor to effect the act"); United States v. Noreikis, *supra* 481 F.2d at 1181 ("the commission of an overt act, the 'doing some-

thing directly moving toward, and bringing him nearer, the crime he intends to commit'"); People v. Buffum, *supra*, 256 P.2d at 321 ("there must be some *appreciable fragment* of the crime committed . . . . the act must not be equivocal in nature"). The use of the word "conduct" indicates that omission or possession, as well as positive acts, may in certain cases provide a basis for liability. The phrase "substantial step," rather than "overt act," is suggested by Gregg v. United States, *supra* ("a step in the direct movement toward the commission of the crime"); United States v. Coplon, *supra* ("before he has taken the last of his intended steps") and People v. Buffum, *supra* ("some *appreciable fragment* of the crime") and indicates that the conduct must be more than remote preparation. The requirement that the conduct be strongly corroborative of the firmness of the defendant's criminal intent also relates to the requirement that the conduct be more than "mere preparation," and is suggested by the Supreme Court's emphasis upon ascertaining the intent of the defendant, United States v. Quincy, *supra*, and by the approach taken in United States v. Coplon, *supra* 185 F.2d at 633 (". . . some preparation may amount to an attempt. It is a question of degree").[6]

6. Our definition is generally consistent with and our language is in fact close to the definitions proposed by the National Commission on Reform of Federal Criminal Laws and the American Law Institute's Model Penal Code.

Section 1001 of the proposed federal criminal code provides as follows:

"(1) Offense. A person is guilty of criminal attempt if, acting with the kind of culpability otherwise required for commission of a crime, he intentionally engages in conduct which, in fact, constitutes a substantial step toward commission of the crime. A substantial step is any conduct which is strongly corroborative of the firmness of the actor's intent to complete the commission of the crime. Factual or legal impossibility of committing the crime is not a defense if the crime could have been committed had the attendant circumstances been as the actor believed them to be."

This proposed section was changed slightly from the version proposed in the Study Draft:

"(1) Offense. A person is guilty of criminal attempt if, acting with the kind of culpability otherwise required for commission of an offense, he intentionally engages in conduct constituting a substantial step toward commission of the offense. A substantial step is any conduct, whether act, omission, or possession, which is strongly corroborative of the firmness of the actor's intent to complete the commission of the offense. Factual or legal impossibility of committing the offense is not a defense if the offense could have been committed had the attendant circumstances been as the actor believed them to be."

A comment justifying the study draft version of proposed section 1001 appears at 1 Working Papers of the National Commission on Reform of Federal Criminal Laws, 351–368 (1970).

Proposed section 1001 is generally consistent with, and probably taken in part from, section 5.01 of the Model Penal Code (Proposed Official Draft 1962):

"(1) *Definition of Attempt.* A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

"(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

"(b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or

"(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(2) *Conduct Which May Be Held Substantial Step Under Subsection (1)(c).* Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose."

Also, see the recently adopted tests for attempt in the following states, among others: Colorado—§ 40–2–101, Colorado Crim.Code, approved June, 1971; Georgia—§ 26–1001, Tit. 26, adopted 1968; Hawaii—§ 500, Act 9, 1972, to be codified as Tit. 37, Hawaii Rev.Stat.; Illinois—Art. 8–4, Ill.Crim.Code, 1961; Kansas—§ 21–3301, ch. 180, 1969 laws; Kentucky—§ 50, Ky. Penal Code, adopted in 1972; Oregon—§ 54, Ore.Crim. Code of 1971.

### III.

The district court charged the jury in relevant part as follows:

"Now, the essential elements required in order to prove or to establish the offense charged in the indictment, which is, again, that the defendant knowingly and intentionally attempted to distribute a controlled substance, must first be a specific intent to commit the crime, and next that the accused wilfully made the attempt, and that a direct but ineffectual overt act was done toward its commission, and that such overt act was knowingly and intentionally done in furtherance of the attempt.

" * * * In determining whether or not such an act was done, it is necessary to distinguish between mere preparation on the one hand and the actual commencement of the doing of the criminal deed on the other. Mere preparation, which may consist of planning the offense or of devising, obtaining or arranging a means for its commission, is not sufficient to constitute an attempt, but the acts of a person who intends to commit a crime will constitute an attempt where they, themselves, clearly indicate a certain unambiguous intent to wilfully commit that specific crime and in themselves are an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstances not intended in the original design."

(Tr. Jury Trial Proc., pp. 138–139.) These instructions, to which the defendant did not object, are compatible with our view of what constitutes an attempt under section 846.

After the jury brought in a verdict of guilty, the trial court propounded a series of four questions to the jury:

"(1) Do you find beyond a reasonable doubt that on the 29th day of March, 1973, Roy Mandujano, the defendant herein, knowingly, wilfully and intentionally placed several telephone calls in order to obtain a source of heroin in accordance with his negotiations with Officer Cavalier which were to result in the distribution of approximately one ounce of heroin from the defendant Roy Mandujano to Officer Cavalier?"

"(2) Do you find beyond a reasonable doubt that the telephone calls inquired about in question no. (1) constituted overt acts in furtherance of the offense alleged in the indictment?"

"(3) Do you find beyond a reasonable doubt that on the 29th day of March, 1973, Roy Mandujano, the defendant herein, knowingly, wilfully and intentionally requested and received prior payment in the amount of $650.00 for approximately one ounce of heroin that was to be distributed by the defendant Roy Mandujano to Officer Cavalier?"

"(4) Do you find beyond a reasonable doubt that the request and receipt of a prior payment inquired about in question no. (3) constituted an overt act in furtherance of the offense alleged in the indictment?"

Neither the government nor the defendant objected to this novel procedure. After deliberating, the jury answered "No" to question (1) and "Yes" to questions (3) and (4). The jury's answers indicate that its thinking was consistent with the charge of the trial court.

 The evidence was sufficient to support a verdict of guilty under section 846. Agent Cavalier testified that at Mandujano's request, he gave him $650.-00 for one ounce of heroin, which Mandujano said he could get from a "good contact." From this, plus Mandujano's comments and conduct before and after the transfer of the $650.00, as described in Part I of this opinion, the jury could have found that Mandujano was acting knowingly and intentionally and that he

engaged in conduct—the request for and the receipt of the $650.00—which in fact constituted a substantial step toward distribution of heroin. From interrogatory (4), it is clear that the jury considered Mandujano's request and receipt of the prior payment a substantial step toward the commission of the offense. Certainly, in the circumstances of this case, the jury could have found the transfer of money strongly corroborative of the firmness of Mandujano's intent to complete the crime. Of course, proof that Mandujano's "good contact" actually existed, and had heroin for sale, would have further strengthened the government's case; however, such proof was not essential.

### IV.

■■■ Mandujano claims prejudicial error with regard to two evidentiary questions. The first question arose near the beginning of Agent Cavalier's testimony:

"A. Shortly after we have been talking for awhile, Mr. Mandujano looks at Mr. O'Leary and asks Mr. O'Leary if he was looking for stuff. I entered saying, 'Yes, I was.'

"Q. In your understanding, what were you talking about, the stuff?

"MR. ALEXANDER [Attorney for Defendant]: Objection. This would be a conclusion on the witness' part.

"MR. PINCKNEY [U.S. Attorney]: Of his own state of mind, your Honor, not someone else's.

"THE COURT: How long have you been in the job that you have?

"A. Since May, 1972, sir, on my present assignment.

"THE COURT: And how many times have you acted in an undercover capacity?

"A. Between November of '72 and May of '73 I acted in a total un-

dercover capacity eighty-six times, I believe, sir.

"THE COURT: In your experience dealing in the narcotics traffic, what have you understood the word 'stuff' to mean? I am asking it, counsel, and the record will reflect that you are objecting to it, and the Court will overrule the objection.

"A. 'Stuff' on the street, between narcotic traffickers and some of the local people in those streets, 'stuff' refers to narcotics."

(Tr. 24–25.) Mandujano argues that allowing Cavalier to testify as to his understanding of the word "stuff" exposed the jury to the inference that Mandujano dealt in narcotics. In the light of Cavalier's later testimony that Mandujano said he had good brown Mexican heroin available for sale, if Cavalier would wait until the regular man made his deliveries, and that Mandujano later tried to locate an immediate source of heroin for Cavalier, it is doubtful that Cavalier's testimony on this point was prejudicial. At any rate, a trial court has some latitude in permitting a witness on direct examination to testify as to his conclusions, based on common knowledge or experience. See United States v. Trenton Potteries, 1927, 273 U.S. 392, 407, 47 S.Ct. 377, 71 L.Ed. 700; Batsell v. United States, 8 Cir. 1954, 217 F.2d 257, 262; Wiley v. United Sates, 8 Cir. 1958, 257 F.2d 900, 908; VII Wigmore Evidence (3rd ed.) §§ 1923, 1924, 1925. The court in this instance ascertained that Cavalier had wide experience as an undercover agent dealing in the narcotics traffic. We conclude that the trial court acted within its discretion in allowing Cavalier to testify as to his understanding of the word "stuff."

■■■ The second evidentiary question developed near the end of Cavalier's testimony. Cavalier had just testified that "We aborted the deal" (Tr. 31), and the United States Attorney proposed to ask Cavalier why he didn't try to contact Mandujano again After a bench con-

ference and then a conference in the absence of the jury, the trial court decided to allow the following which was read to the jury by the court reporter:

"Q. Subsequent to the calls that you received on the evening of March 29th, 1973, why did you not again attempt to contact Mr. Mandujano?

"A. Based on the information that I had received, it would be unsafe for either my informant or myself to return to this area."

(Tr. 40.) The court cautioned the jury immediately that the answer to this question was admitted "only to show what was in his mind, not as proof to you or any evidence to you that it actually was unsafe, but only what he had been told and why he didn't go back." As limited by the trial court, the testimony was admissible to show Cavalier's state of mind. See VI Wigmore, Evidence (3rd ed.) § 1789. This testimony was not so inherently prejudicial that the trial court should have suppressed it.

For the reasons stated in this opinion, the judgment is

Affirmed.