**UNITED STATES of America, Plaintiff,**

v.

**Bernard SHAPIRO, Defendant.**

**No. 81–361–CR–EBD.**

United States District Court, S. D. Florida.

Jan. 27, 1982.

Carolyn Heck, Asst. U. S. Atty., Miami, Fla., for plaintiff.

William Isenberg, Fort Lauderdale, Fla., for defendant.

## ORDER

EDWARD B. DAVIS, District Judge.

The Defendant, Bernard Shapiro, was charged in a two count indictment on August 20, 1981. Count I accused the defendant of conspiring with others to violate Title 18, United States Code, Sections 1952 [1] and 2 [2]; all in violation of Title 18, United States Code, Section 371.[3] Count II alleged that the defendant attempted to distribute more than 1,000 pounds of marijuana in violation of Title 21, United States Code, Sections 841(b)(6) and 846.

A bench trial was conducted on January 12 and 13, 1982. After the government rested its case, defendant submitted no evidence or testimony.

### Facts

From some time prior to June of 1981 until August 4, 1981, the Federal Bureau of Investigation conducted an undercover business under the name of "C.R.V. Associates" (C.R.V.) as a part of its investigation, known as "Operation Bancshares", of the laundering of drug money in Southern Florida. The offices of C.R.V., located in Miami, were equipped with devices to record the transactions and activities at C.R.V.

C.R.V., which took customers by referral only, offered its customers numerous services for the conversion of customer's cash into other financial instruments and transactions. One such service, employed by this defendant, consisted of the customer bringing cash to C.R.V. and C.R.V. having the money wire transferred to a bank account, per the instruction of the customer's associates, for transmittal to Columbia, South America.

In the case at bar, C.R.V. charged a 2% commission for its services. C.R.V. kept a

---

1. Interstate and foreign travel or transportation in aid of racketeering enterprise.

2. Principal.

3. Conspiracy.

part of this commission, equalling ¾% as earnings which ultimately accrued to the United States. C.R.V. had the balance of this commission, equalling 1¼% forwarded to one Elias Facuseh. Of this 1¼%, ¾% was owed to Elias Facuseh for referring the customer. The remaining ½% portion was owed to Jorge Facuseh, the brother of Elias, for disbursing the money to the ultimate recipient in Columbia, South America.

On July 20, 1981, defendant Shapiro telephoned C.R.V. and spoke with Special Agent Antonio Franco, who was using the undercover name of Tony Fernandez. The defendant introduced himself as Barry, a friend of Jorge "F". The defendant stated that Jorge Facuseh suggested that the defendant set up an appointment with C.R.V.; which he did.

Thereafter, on July 20, 1981, the defendant came to the premises of C.R.V. Defendant inquired about "Elias" and revealed that he had been working with Elias Facuseh to settle an account with an outstanding balance. Defendant stated further that he was receiving money from several Canadians, and that he would have about $100,000.00 the following day. In responding to a query as to whom would the money go to in Columbia, defendant indicated, "Jacobo de Andries . . . they know him down there . . . They done it before". Defendant went on to reveal that he is a pilot who occasionally takes charters. When asked by an undercover agent if he flew "Marimba"[4] in from Santa Marta, the defendant answered, "I used to. I'm retired", and stated that he continued to do "other things" such as "fly people . . . money. Translation. Surveillance". The defendant, after informing the agents that he would call "as soon as these Canadians get here and bring me . . . all the paper", departed.

On Thursday, July 23, 1981, the defendant again telephoned and arranged to come to C.R.V. The defendant arrived carrying a shopping bag, supposedly containing $50,-000.00. However, upon counting the money in the defendant's presence, the agents determined that it contained only $49,800.00. The defendant took $200.00 from his person to make up the shortage. Defendant Shapiro instructed the agents to send the money to Jacobo de Andreis. The defendant said that Jorge Facuseh knew Jacobo de Andreis, and that the agents probably would talk to Jorge Facuseh. Defendant Shapiro added that he had a $800,000.00 balance with Jacobo de Andreis and that if everything went well, defendant would owe Jacobo de Andreis an extra $4,000,000.00 by the end of the summer.

Agent Franco then asked the defendant whether this money was for "Marimba". The defendant nodded his head. Agent Franco inquired further as to whether any was for cocaine. The defendant shook his head. Agent Franco next asked the defendant if he had any "Marimba" to sell in this area. Defendant Shapiro answered that he had 2,000 pounds of "good stuff" for sale at $210.00 per pound, which he could deliver immediately to C.R.V. The Defendant explained that the 2,000 was available because the Canadians had not purchased it. The defendant declared that the marijuana was "not brokerage deal . . [I]t's mine".

Before leaving, defendant asked the agents if they would care for a sample, to which the agents responded affirmatively. Defendant said he would return the next day with the sample as well as with the same amount of money. Defendant also mentioned that the marijuana was from the other side of Santa Marta, and that since he was so pleased with it, he planned to "do more business with these people . . another $50,000.00".

The next day, defendant did indeed return with three small plastic bags containing 208.4 grams of marijuana. The first bag, according to defendant, was his merchandise; was the best, and was available for $210.00 per pound, with about 2,000

---

4. Testimony of the agents revealed that "Marimba" is a commonly used Spanish term for marijuana. Defendant Shapiro apprised the agents that he spoke Spanish, and conversed in both Spanish and English on the tapes.

pounds ready for sale. The second bag, which was his partner's, was for $180.00 per pound, with about 2,500 pounds available. The third bag, which was a friend's, was available for $170.00 per pound, with nearly 10,000 pounds ready for sale. Defendant requested that the agents promptly reply to his offer, and indicated that he would deliver the marijuana in installments.

Defendant also brought along $50,000.00 in cash to be sent to Jacobo de Andreis. Upon leaving, defendant Shapiro asked if the agents would send his regards to Elias Facuseh.

The defendant returned to C.R.V. on Monday, July 27, 1981, and brought another $50,000.00 cash to be wired to Jacobo de Andreis. The agents at C.R.V. were apprised by defendant that the money he had delivered to C.R.V. on Thursday, July 23, 1981 had been received in Columbia on Friday, July 24, 1981. Moreover, the defendant requested that the agents provide him with a cashier's check for $12,234.00 payable to "Airesearch", to pay for the inspection of an airplane. The agents received cash for the check amount and a 1% commission. Defendant queried the agents as to the marijuana samples, to which they responded that their buyer was in Panama.

The final cash transmittal request of the agents by defendant occurred on Tuesday, July 28, 1981 at the offices of C.R.V. The cash transmittal was supposed to be for $45,000, but defendant had only $44,510, promising to have the shortage transmitted at the next transaction. Again, the money was for Jacobo de Andreis. Unlike before, the defendant registered a complaint with the agents that he had received a complaint that Friday's money had not yet been received. He then asked if the agents would check into this with Elias Facuseh. A short time later, defendant's cashier check arrived. In departing company with the agents, defendant informed them that although he would be out of town for awhile, he would call them about the buyer when he returned.

It is clear from the testimony taken at the trial that the agents did indeed transmit the money received from defendant Shapiro, minus the 2% commission to their account at Southeast First National Bank of Miami, and then to an account of Jorge Facuseh at Continental National Bank of Miami. This result occurred consistently after the agents had conversed with Elias Facuseh. On a whole, $190,620.00 had been provided by defendant to the agents for transmittal to Jorge Facuseh in Columbia. The commission money owed to Elias and Jorge Facuseh was picked up either by representatives of Elias Facuseh or Elias Facuseh himself on July 23, 26 and 29, 1981.

## COUNT I

Count I alleges that on or about July 20, 1981 and up to and including August 4, 1981, the defendant and unnamed individuals conspired to commit an offense against the United States, namely: to violate Title 18, U.S.C. § 1952 and 2.

To be found guilty of this offense, the following elements [5] must be provided:

1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

2) That the defendant willfully became a member of such conspiracy;

3) That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods (or "overt acts") described in the indictment; and

4) That such "overt act" was knowingly committed at or about the time alleged in an effort to effect or accomplish some object or purpose of the conspiracy.

As to element number 1, the Court finds that Barry Shapiro came to a mutual understanding with other persons, including but

**5.** According to Pattern Jury Instructions for the Fifth Circuit Criminal Cases, Offense Instruction Number 3. (Conspiracy)

not necessarily limited to Elias Facuseh, Jorge Facuseh and Jacobo de Andreis, to try to accomplish the common and unlawful plan of using and causing to be used facilities in interstate and foreign commerce with intent to distribute the proceeds of a business enterprise involving the distribution of marijuana, in violation of Title 21, United States Code, and with the further intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of that business enterprise.

As to element number 2, the Court finds that the defendant, Shapiro, willfully became a member of the conspiracy.

As to element number 2, the Court finds that during the existence of the conspiracy, the defendant, Shapiro, one of the conspirators, knowingly committed the following overt acts, described in the indictment:

a. On or about July 20, 1981, in Miami, in the Southern District of Florida, the defendant met with undercover agents of the FBI.

b. On or about July 23, 1981, in Miami, in the Southern District of Florida, the defendant delivered to undercover agents of the FBI approximately $50,000.00 in cash.

c. On or about July 24, 1981, in Miami, in the Southern District of Florida, the defendant delivered to undercover agents of the FBI approximately $50,000 in cash.

d. On or about July 27, 1981, in Miami, in the Southern District of Florida, the defendant delivered to undercover agents of the FBI approximately $50,000 in cash.

e. On or about July 28, 1981, in Miami, in the Southern District of Florida, the defendant delivered to undercover agents of the FBI approximately $44,510.00 in cash.

As to element number 4, the Court finds that each overt act described above was committed at or about the time alleged in an effort to effect or accomplish some object or purpose of the conspiracy, to wit: to distribute the proceeds of a business enterprise involving the distribution of marijuana facilitate the carrying on of that enterprise.

## COUNT II

▮ Count II alleges that between July 23, 1981 and July 28, 1981, defendant Shapiro attempted to distribute more than 1,000 pounds of marijuana.

The elements of this offense, which must be proved, are:

1) That the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime he is charged with attempting. That is, the defendant possessed the required intent to unlawfully distribute in excess of $1,000.00 pounds of marijuana. *United States v. Mandujano*, 499 F.2d 370 (5th Cir. 1974)

2) That the defendant engaged in conduct which constitutes a substantial step toward commission of the crime. That is, the acts were unique rather than so commonplace that they are engaged in by persons not in violations of the law. *Mandujano, supra; United States v. Rivero*, 532 F.2d 450 (5th Cir. 1976).

As to element number 1, the Court finds that defendant, Shapiro, under the circumstances of this case, purposefully and intentionally performed acts which constituted a firm offer to achieve the goal of unlawfully distributing marijuana.

As to element number 2, this Court finds that defendant, Shapiro, advised the agents that he would sell to them the marijuana he had available; that defendant expressed a preference to deliver the marijuana in installments, at the door of C.R.V.; and that defendant provided samples of the various qualities of marijuana available for sale by him, thereby clearly manifesting a present ability to meet the terms of his offer upon immediate acceptance. This kind of conduct is definitely a substantial step towards unlawfully distributing marijuana; and is unique and not commonly engaged in by persons not in violation of the law.

Based upon the aforementioned application of the law on the facts as found by this Court, it is hereby

ORDERED and ADJUDGED that the defendant is GUILTY as charged on both Counts of the indictment.