UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert A. NOREIKIS et al.,
Defendants-Appellants.

No. 72-1341.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1973.

Decided June 14, 1973.

Rehearing Denied July 13, 1973.

Jerome Rotenberg, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, Stephen J. Cloud, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

Defendants Noreikis, Hibma, and Rothrock appeal from their convictions for attempting to manufacture a quantity of Dimethyltryptamine (DMT), a schedule I controlled substance, in violation of 21 U.S.C. § 846. Their principal contentions on this appeal relate to an alleged deficiency in the affidavit supporting the request for a search warrant and to alleged improprieties in the manner in which the search pursuant to the warrant was executed. The defendants also challenge the sufficiency of the evidence. The search and seizure issues

were raised at a pretrial hearing and the appropriate motions were denied by the district court without any findings of fact. The bench trial of the case followed immediately thereafter and a judgment of guilty was entered by the court, once again without findings of fact.[1]

Appellants first contend that the affidavit for search warrant executed by John T. Peoples, Special Agent, BNDD (Bureau of Narcotics and Dangerous Drugs), was insufficient to allow the magistrate to make an independent determination that probable cause existed to issue the warrant. The application itself consists of two affidavits. The first, part of which is a standard printed form, sets forth that 13 different chemicals (all in specified amounts) were to be found at 436 West 118th Street, Chicago, and that these chemicals "are precursors and reagents of a schedule I(c) controlled drug and the possession of which is illegal pursuant to Title 21 U. S.C. 841(a)(1) & (2) when possessed with the intent to manufacture." The second affidavit of Special Agent Peoples traces four of the chemicals—lithium aluminum hydride, methanol, acetone, and ethyl ether—into the house, detailing how the BNDD agents had knowledge that these chemicals were in fact in the house at 436 West 118th Street. The affidavit ends with the statement: "13. That the above described chemicals are known to your affiant as the essential precursors and reagents necessary to produce the Schedule I Controlled Substance Dimethyltryptamine."

If the magistrate had relied only upon the second affidavit, the validity of the issuance of the warrant would have been questionable for three of the chemicals have substantial individual household uses—methanol, acetone, and ethyl ether —and the fourth, lithium aluminum hydride, although it might be a "red flag" which would merit suspicion, would not necessarily establish probable cause to believe illegal drugs were to be manufactured. United States v. Failla, 343 F. Supp. 831 (W.D.N.Y.1972). Although the agents were aware that the various chemicals were being purchased in a surreptitious manner, for some reason this fact was not adverted to in the affidavit. *Cf.* United States v. Moore, 452 F.2d 569 (6th Cir. 1971). However, the issue does not turn on the second affidavit alone for we have two affidavits which must be read *in pari materia.*

The purpose for requiring an affidavit for a warrant is to allow the magistrate to make an independent determination of whether there is probable cause to support the issuance of a warrant. The magistrate must be given the facts so that he can make an independent judgment and not rely on the mere conclusions of the officer. *See* Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). "[A]ll data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." United States v. Anderson, 453 F.2d 174, 175 (9th Cir. 1971). *Cf.* United States v. Harris, 403 U.S. 573, 580–581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). We also must note, however, the admonition of the Supreme Court that "the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380

---

1. While special findings of fact are not required by Rule 23, Fed.R.Crim.P., in the absence of a request, their lack in the case of close or questionable determinations deprives an appellate court of knowledge of the basis on which the issue or issues were decided.

U.S. 102, 109, 85 S.Ct. 741, 746, 13 L. Ed.2d 684 (1965).

When we read the two affidavits together in a commonsense way, we agree with the result reached by the district court that the magistrate had a sufficient basis to find probable cause to support a search warrant. We reach this conclusion in part by analogy to the cases considering the sufficiency of affidavits which rely on tips from informers. In Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 27 L.Ed.2d 637 (1969), the Court mandated a two-pronged test for such affidavits: the affidavit should set out, first, the underlying circumstances necessary to enable the magistrate independently to judge the validity of the informant's conclusion that a crime was being committed, and, second, facts to support the above circumstances and show that they were credible and reliable. The first affidavit—in which the agent swore positively as to the presence of 13 chemicals on the premises of the house to be searched—satisfies the first prong of the test. A magistrate could conclude that one who had assembled or possessed those chemicals was in fact doing so with the intent to manufacture a controlled substance even though it did not include every essential chemical.[2] The second, and more detailed, affidavit then serves to meet the second prong of the test. It reflects the basis for the government agent's knowledge that some of the chemicals were on the premises, thus providing facts to support the credibility and reliability of the first affidavit. That the second affidavit traces into the house only four of the thirteen chemical agents named in the first affi-

davit does not make it insufficient. The government need not, in its affidavit, corroborate every detail, but there should be at least a representative number of the details in order to give suitable reliability for a warrant to issue. Here there was.

The agent was not relying on an informant's tip but rather on the investigative work of the BNDD agents when he swore that certain chemicals were on the premises; the corroborative background as to how this knowledge was obtained is necessary in such measure as to give the magistrate confidence in the reliability of the first affidavit. The situation is comparable to the revelation of past instances of reliable tips by an informant to demonstrate that his present tip should be credited. While upholding the issuance of the warrant in this case, we must also observe that better practice would be to err on the side of as much specificity as possible to avoid the possibility of a successful subsequent suppression attempt.

■ Appellants raise a second, and equally serious, challenge to the admission of the evidence seized at Hibma's house. Appellants contend that in executing the search warrant the agents violated 18 U.S.C. § 3109,[3] in that they did not announce their purpose or authority nor did they wait until "refused admittance" before breaking open the doors to the house. The Supreme Court has held in Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), and Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), that failure to comply with 18 U.S.C. § 3109 compels suppression of any evidence seized during the search. In both *Miller* and *Sabbath* the Court

---

2. Appellants also contend that the search warrant itself was insufficient because it failed to allege possession of any illegal drug. The chemicals specified were precursors of DMT and the allegations are sufficient under Rule 41(b)(2), Fed. R.Crim.P.

3. 18 U.S.C. § 3109 provides:
 "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

emphasized that 18 U.S.C. § 3109 was merely the codification of the common law rule which required officers of the law to give notice of both their authority and their purpose before forcing entry to a man's home. Procedures smacking of Gestapo tactics should have no place within the American system of law enforcement. There is no claim of "exigent circumstances" in the present case but the question is solely whether there was sufficient compliance with the statute to negate suppression.

The testimony on this issue at the pretrial hearing was somewhat contradictory. The appellants attempt to cast doubt upon the testimony of some of the agents as to what they did or did not do; however, we must look at the evidence in the light most favorable to the government, leaving the determination of credibility to the district court.

The Hibmas arrived home at approximately 11:30 p. m. At approximately the same time, if not somewhat before, Agent Peoples arrived with the search warrant. The house itself had been under surveillance since at least 6 p. m. that day. There were 14 persons in the raiding party, 3 of whom were government chemists who were to examine the evidence seized. After the Hibmas entered the house, the agents waited and, when the house was completely dark at about midnight, they split into groups and at a prearranged time began to knock at each of the house's three doors. At trial both sides seem to have agreed that the front door was the first one broken open. As to that door, Agent Skaggs testified that he thought he heard movement inside before he knocked and that he definitely heard a dog running and barking inside after he knocked. He stated that he was unable to find the doorbell and so knocked loudly, at the same time announcing his authority and purpose. He then knocked again and repeated his announcement. After waiting about 30 seconds without hearing any response, he kicked the door in. During the time he was knocking, he was unable to hear any other agents knocking or announcing their authority and purpose.

The testimony of the other agents was similar to that of Agent Skaggs, except that it appears that Agent Thompson, who was assigned to the basement door, waited approximately a minute and a half to two minutes before he broke in the door.

Both Hillary and George Hibma testified that they did not hear any knocking or announcements. In fact, they were both in bed when they heard the dog bark. Appellant Hibma then went to look at the front door and when he saw the people congregated outside his front door he started to return to the bedroom to put on some clothes. At this point the door was kicked in.

We have no way of knowing whether the district court gave any credence to the testimony of Hibma and his wife; however, for the purpose of this appeal we must take it that the agents did announce their authority and purpose. Thus, United States v. Likas, 448 F.2d 607 (7th Cir. 1971), is clearly distinguishable. The real issue involved in this appeal is whether or not they had been legally "refused admittance" before they forced open the doors.

 It is not necessary that the agents wait until the occupants of a house have affirmatively or articulately refused them entrance before they can break in. "Such refusal is present where it can reasonably be inferred from the actions or inaction of the occupants of the premises to be searched." United States v. Augello, 368 F.2d 692, 694 (3d Cir. 1966), vacated on other grounds, 390 U.S. 200, 88 S.Ct. 900, 19 L.Ed.2d 1036 (1968). In *Augello,* the federal officer knocked on the front door and announced his purpose, at which point the defendant's sister went running toward the rear of the house yelling the appellant's name, the very person for whose arrest the officers had a warrant. The court found these facts sufficient to justify an inference of refusal of admission.

The cases involving implied or inferred refusal based solely on failure of the occupants to respond to the announcement of authority and purpose provide less clear guidelines. The Second Circuit summarily approved breaking in after agents had waited a "minute or two, maybe more," in United States v. Viale, 312 F.2d 595, 602 n.6 (2d Cir. 1963), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199. Judge Stevens set forth some aspects of the issue in United States v. Pratter, 465 F.2d 227, 230–231 (7th Cir. 1972):

> "The statute applies to a critical situation which is fraught with danger for the entering officers as well as the occupants of the dwelling. Prompt action and surprise may be necessary to forestall escape, the destruction of evidence, or even violence; yet prompt action and surprise may also precipitate such consequences. In short, the execution of a warrant is a job for a professional, trained both to perform his mission and to heed the statutory command to show a decent respect for the privacy of the citizen before bursting into his home." (Footnote omitted.)

Applying the above principles to the facts before us, it appears that the agents did not violate § 3109 when they forced open the doors to the Hibma house. We particularly note that both Hibmas had time to move about the house after the happening of what could reasonably be assumed was the knocking and announcing. The fact that Hibma chose to return to the bedroom in order to get dressed does not rebut the inference that the agents had waited a sufficient amount of time to allow someone to answer the knock if the occupants intended to answer it at all. We also note that other courts have upheld searches after the officers waited approximately a minute before forcing the

door, e. g., United States v. Woodring, 444 F.2d 749, 751 (9th Cir. 1971).

Appellants emphasized on this appeal that many of the chemicals found in the Hibma basement had recognized legal uses. We may safely assume that if time had permitted the destruction of key chemicals,[4] and destruction had in fact followed, the above contention as to the remaining innocuous ones would have been asserted here even more vigorously. One of the basic purposes, of course, for the law permitting this type of invasion is to avoid the possibility of the destruction of evidence of criminal activity.

Finally, appellants contend that even if the evidence was properly seized, the government failed to present sufficient evidence to show that the appellants had actually attempted to make the illegal substance. Appellants point to the lack of a power supply to run the pump as well as the fact that all of the chemicals were in a sealed and unopened condition.

In essence, appellants contend that at most they were only preparing to manufacture and that this is insufficient under the law to constitute an attempt to manufacture, with which they were charged in the indictment. While it seems to be well settled that mere preparation is not sufficient to constitute an attempt to commit a crime, 22 C.J.S. Criminal Law § 75(2)b, at 230 et seq., it seems equally clear that the semantical distinction between preparation and attempt is one incapable of being formulated in a hard and fast rule. The procuring of the instrument of the crime might be preparation in one factual situation and not in another. The matter is sometimes equated with the commission of an overt act, the "doing something directly moving toward, and bringing him nearer, the crime he intends to commit," 22 C.J.S., *supra* at 231. "To manufacture" could for our present purposes be

---

4. For example, there was only one ounce of indole in the basement. A defense expert testified that this was an essential ingredient of DMT.

reasonably defined as a process of combining ingredients to make a new product. The process could not occur unless the necessary ingredients were assembled. Arguably once the process of putting two ingredients together commenced there would be in existence a process of manufacturing even before the finished product emerged. In such event, it could be said that there was no longer an attempt to manufacture but an actual manufacturing. We do not need to decide, however, whether the finished product must have been realized for manufacturing as such to exist, for here, in our opinion, the steps went beyond mere preparation.

The testimony indicated that the chemicals in the basement were sufficient to synthesize DMT. As to the allegedly missing items of equipment, although a pump would have been useful for speeding the process and thereby obtaining a purer product, this was not deemed necessary.[5] As to the lack of a source of heat, the appellants' own expert witness testified that even a candle would be sufficient. Nor is the fact that no formula showing how to synthesize DMT was found on the premises sufficient to undercut the holding that an attempt to manufacture had legally materialized. This was not a situation of playing with a juvenile chemistry set.

The preparations had progressed to the level of an attempt. See United States v. Coplon, 185 F.2d 629, 633 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S. Ct. 362, 96 L.Ed. 688 (1952).

For the reasons hereinbefore set forth, the judgment of the district court is affirmed.

Affirmed.

SWYGERT, Chief Judge (dissenting).

This case, we are told, may be decided "by analogy to the cases considering the sufficiency of affidavits which rely on tips from informers."[1] I fail to perceive a reason for this. No contention is made that an informant played a part in providing the information set forth in the warrant affidavit; indeed, mention is made of "reliability" and "credibility" only in connection with Government Agent Peoples, who, being the warrant affiant, was not an informer as I understand the term.[2] To class the informer cases as inapposite, however, is not to say that no law bears on the topic. Quite to the contrary, numerous cases of the Supreme Court have dealt with precisely the issue before us. On their authority, I submit that the decision made today is plainly in error.

It is a proposition long settled that a warrant may not issue upon a sworn al-

5. Further, the evidentiary aspects of the lack of power for the pump is something less than clearly persuasive. This was developed on cross-examination of a government forensic chemist who, when he was asked as to what type of power supply or source would be needed, replied, "I am not an expert, but it appears that it would need an electrical source of some sort because of the wires here." He further said in response to a leading question that it would have to be some type of electrical source other than plugging it into a wall socket. We are left in the dark as to whether the pump required a heavier voltage than was available in the house or whether an item familiar to every householder, the heavy duty extension cord, could have been dropped down the basement stairway.

1. Judge Pell writes that the informer cases provide support "in part" for the conclusion that the warrant was properly issued. I am unable to discern any supportive rationale separate from the informant analysis.

2. Agent Skaggs, whom Peoples repeatedly mentions in his affidavit, could conceivably fit that category. What he reported to Peoples appears entirely as hearsay in the affidavit. But the affidavit does mention that Skaggs was an agent of the BNDD, an allegation which may act to establish Skaggs' reliability and satisfy the requirement of the informer cases. United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); 8A J. Moore, Federal Practice ¶ 41.04 [3] (1972).

legation that an officer "has cause to suspect and does believe" that illegal activity is taking place upon specified premises. Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). More must be alleged:

> Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation. Mere affirmance of belief or suspicion is not enough. 290 U.S. at 47, 54 S.Ct. at 13.

This mandate exists to insure that the inference of probable cause from facts known to an officer be drawn by a neutral and detached magistrate rather than the officer himself, "engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L. Ed. 436 (1948). Where an officer has personally uncovered the facts upon which he grounds his request for a warrant, the law requires an affirmative sworn allegation that he speaks with personal knowledge of the matters set forth in his affidavit. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). When others have provided him, wholly or in part, with information detailed as hearsay in his affidavit, additional data must be presented. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 27 L. Ed.2d 637 (1969). As was stated in a narcotics case:

> Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, was "credible" or his information "reliable." Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

The informant must have firsthand knowledge of the illegal transaction and the officer must vouch for his credibility. But the cases have never held that the officer must vouch for his own credibility or obtain an independent verification of his reliability.

Nevertheless,. the majority opinion is replete with references to a duty incumbent upon Agent Peoples "to support the credibility and reliability" of the conclusory statement of offense made by Peoples in what the majority terms the "first affidavit." This is plainly a bootstrap technique. By grafting a credibility requirement onto the personal knowledge requirement of *Giordenello,* the majority impermissibly dilutes the factual showing long required of the Government when it seeks a search warrant. The Government, it is said, need allege only a few of the facts upon which it bases a claim of illegal activity; if these facts tend in some manner to support a conclusory and general allegation of crime made by the government agent in the same affidavit, credibility of the affiant has been shown and the conclusory allegation is to be taken at face value. This is a logical feat that will not bear muster. The credibility of a police officer is irrelevant in this context. History has taught that conclusory statements made by law enforcement agents are presumptively incredible; the agents must adduce facts and, while they may indicate their conclusions, must leave to a magistrate the final say on probable cause. Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933).

The sole question we must decide is whether the papers placed before the magistrate set forth facts sufficient to support a finding of probable cause. The majority divides these papers into two groups: the first page comprises the "first affidavit," the remainder makes up the "second affidavit." [3] By so doing, it may be inferred that the majority views each as containing factual matter relevant to the general allegation of wrongdoing made on the first page. I disagree. The "first" affidavit *is* the general allegation of wrongdoing and nothing more.[4] This is plain on its face. After describing the suspect premises and listing the chemicals involved in the supposed attempt to manufacture DMT, the affidavit continues:

> And [the affiant represents] that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:
>
> See Attached Affidavit

The "Attached Affidavit" is, of course, the "second" affidavit.

The conclusion is inescapable that the warrant stands or falls on the factual allegations of Agent Peoples set out in the "second" affidavit. Given this view, even the majority may agree that the warrant must fall.[5] I would like, nonetheless, to develop this conclusion. Four chemicals are mentioned in the second affidavit. Three are innocuous solvents. The last, lithium aluminum hydride, is at worst a "red flag" meriting suspicion. United States v. Failla, 343 F.Supp. 831 (W.D.N.Y.1972). Expert witnesses for both the defendant and the Government agreed that DMT could not be manufactured from these four chemicals, in direct contradiction to the representation in the affidavit that the chemicals were "the essential precursors and reagents necessary to produce the Schedule I Controlled Substance Dimethyltryptamine." No mention is made of any other chemicals, much less that other chemicals were observed to enter Hibma's house. The affidavit, moreover, fails to reveal even slightly suspicious conduct on the part of any defendant. For all the magistrate knew, no fictitious names were employed, no activity was observed at unusual hours, and no other indica of guilt or clandestine activity were seen to occur. See United States v. Moore, 452 F.2d 569 (6th Cir. 1971). The case, I submit, is essentially on all fours with United States v. Failla, 343 F.Supp. 831 (W.D.N.Y.1972), insofar as that case dealt with the issue of probable cause.

---

3. See Appendix to this dissent.

4. The first page does not reveal whether:
 . . . [T]he affiant spoke with personal knowledge of the matters contained therein; it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made. Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1957).

5. They state:
 If the magistrate had relied only upon the second affidavit, the validity of the issuance of the warrant would have been questionable. . . .
 I am perplexed, however, by another statement:
 A magistrate could conclude that one who had assembled or possessed those [13] chemicals [needed to make DMT] *was in fact doing so with the intent to* manufacture a controlled substance *even though* . . . [the first affidavit] *did not include every essential chemical.* (my emphasis).
 The sentence appears to contain its own contradiction. If it does not, and the thirteen chemicals listed on the first page do not comprise all of the materials essential for DMT manufacture, I read it to hold that the presence of all chemicals essential to such manufacture need not be alleged in even a conclusory fashion prior to obtaining a valid warrant. I can scarcely agree, particularly where the affidavit fails to set forth suspicious conduct on the part of defendants.

I would therefore hold that the evidence obtained by the search warrant should have been suppressed and reverse the convictions.

## APPENDIX TO OPINION OF SWYGERT, C. J., DISSENTING

### UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

Magistrate's Docket No. . . . . . .

Case No. 5310

UNITED STATES OF AMERICA

vs.

A single story single family frame house covered in false yellow brick siding and having a concrete block foundation, known as 436 West 118th Street being the second house west of the intersection of 118th St. & Eggleston Ave located on the north side of 118th St.

Affidavit For
Search Warrant

BEFORE

Name of Magistrate

219 South Dearborn
Chicago, Illinois

———◆———

The undersigned being duly sworn deposes and says:

That he (is positive) that (on the premises known as)

A single story single family frame house covered in false yellow brick siding and having a concrete block foundation, known as 436 West 118th Street being the second house west of the intersection of 118th Street and Eggleston Avenue located on the North side of 118th Street.

the Northern District of Illinois there is now being concealed certain property, namely 1000 grams lithium aluminum hydride, 1000 grams methanoyl, 1 gallon acetone, 6 pounds of ethyl ether, 1 pint tetrahydrofuran, 1 ounce indole crystal, 25 grams oxayl chloride, 1 gallon renzine petrol, 1 quart petroleum ether, 5 pounds sodium sulfate, 1 quart chloroform spectro, 1 pound sodium-hydroxide, 1 pound aluminum mesh and all other fruits and instrumentalities of the crime of possession of a schedule one controlled substance, Title 21 U.S.C. § 841(a)(1), which are precursors and reagents of a schedule I(c) controlled drug and the possession of which is illegal pursuant to Title 21 U.S.C. § 841(a)(1) & (2) when possessed with the intent to manufacture.

is evidence of the crime of possession of a Schedule one Controlled Substance, Title 21 U.S.C. § 841(a)(1).

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

See Attached Affidavit.

Sworn to before me, and subscribed in my presence,

John T. Peoples,
Special Agent, BNDD
November 5, 1971

STATE OF ILLINOIS ⎱
COUNTY OF COOK ⎰ SS

## AFFIDAVIT

JOHN T. PEOPLES, Special Agent, Bureau of Narcotics and Dangerous Drugs, being duly sworn on oath deposes and says as follows:

1. He is a Special Agent of the Bureau of Narcotics and Dangerous Drugs and that in the course of his duties he was assigned to conduct an investigation concerning the order of precursors and reagents of controlled drugs used for the production of a specific Schedule I Controlled Drug, Dimethyltryptamine.

2. That he has been informed by Darrell Skaggs, Special Agent, Bureau of Narcotics and Dangerous Drugs, that a person named Robert ROTHROCKS had ordered from a chemical company, VENTRON CORPORATION, Beverly, Massachusetts, 1000 grams of lithium aluminum hydride and that ROTHROCKS requested that it be sent to 10727 South Prairie and attached a telephone number which could be called in order to insure delivery of the chemical. This number was 841–1795.

3. A check of the telephone records of Illinois Bell Telephone revealed that the telephone subscriber was Harold ROTHROCKS, 14518 South Kenwood, Dolton, Illinois.

4. Affiant was further advised by Special Agent Darrell Skaggs that on November 4, 1971, Agent Skaggs attempted to deliver the above described chemical to 10727 Prairie with negative results. Special Agent Skaggs advised affiant that he was disguised as a United Parcel Service delivery man at the time of the attempted delivery.

5. That Special Agent Skaggs then called the above telephone number and advised the party answering the telephone, who identified himself as Robert ROTHROCKS, that an attempted delivery of the package had been made but that no one was present at 10727 Prairie by the name of Robert ROTHROCKS and that Special Agent Skaggs would not deliver the package to anyone but Robert ROTHROCKS.

6. Special Agent Skaggs further advised affiant that Robert ROTHROCKS then told him to leave the package with Robert A. NORIEKIS at the 10727 Prairie address on November 5, 1971 and indicated to Special Agent Skaggs, that he, Robert ROTHROCKS, would be present to claim the package.

7. On November 5, 1971, Special Agent Skaggs delivered the package of chemicals to 10727 Prairie to 2 individuals identifying themselves as Robert NORIEKIS and Robert ROTHROCKS at approximately 10:45 a. m.

8. Prior and subsequent to the delivery of the package surveillance was conducted on the 10727 Prairie address and the vehicle of Robert ROTHROCKS by your affiant, and other Special Agents of the Bureau of Narcotics and Dangerous Drugs, and during this surveillance the individual known as Robert ROTHROCKS came out of the dwelling located at 10727 Prairie carrying the package which had just been delivered and a large shopping bag.

9. Thereafter, this individual known as Robert ROTHROCKS entered a 4 door Plymouth automobile, bearing Illinois license plate number HE 7831 and drove said automobile to 436 West 118th Street, Chicago, Illinois, and after arriving, got out of the car and carrying the package and shopping bag, entered the bungalow house at this address.

10. A check of license plates of a motorcycle parked at the rear of 436 West 118th Street, bearing license number S7581, revealed that it was registered to a George C. HIBMAN, who lived at 436 West 118th Street, Chicago, Illinois.

11. A short while later Robert ROTHROCKS left the 436 West 118th Street address and drove to 1405 North LeMoyne, the location of FISHER SCIENTIFIC COMPANY, a chemical company, where he was observed to pick up 1 gallon of methanoyl, 1 gallon of acetone, 5 pounds of ethyl ether. These

chemicals were delivered to him by Special Agent Thomas L. Thompson, Bureau of Narcotics and Dangerous Drugs, who was disguised as an employee of FISHER SCIENTIFIC COMPANY.

12. Thereafter Robert ROTHROCKS drove directly back to 436 West 118th Street where he left his automobile and entered, carrying the packages of chemicals.

13. That the above described chemicals are known to your affiant as the essential precursors and reagents necessary to produce the Schedule I Controlled Substance Dimethyltryptamine.

14. That based upon the foregoing information your affiant believes that probable cause exists for the issuance of a search warrant for the above described premises.

. . . . . .

John T. Peoples