UNITED STATES of America,
Plaintiff-Appellee,

v.

Clifford T. GREEN et al.,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

PAY MING LEU, Defendant-Appellant.

Nos. 74–1428, 74–1433, 74–1435,
74–1420 and 74–1468.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1975.

Decided Feb. 27, 1975.

Rehearing Denied March 18, 1975.

Gerald M. Werksman, R. Eugene Pincham, Sidney S. Altman, George Kita, Bernard B. Brody, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gary L. Starkman and Gordon B. Nash, Jr., Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

These consolidated appeals raise the same principal issue: whether indictments against physicians and a pharmacist (registrants under the Controlled Substances Act, 21 U.S.C. § 801 et seq.) for the dispensing or distributing of controlled substances pursuant to prescriptions allegedly issued without a legitimate medical purpose or outside the usual course of professional practice, properly charge crimes under 21 U.S.C. § 841(a)[1] and 21 C.F.R. § 306.04(a).[2]

---

1. 21 U.S.C. § 841 provides:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.
. . .

2. 21 C.F.R. § 306.04 provides:

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the pre-

## I

In 74–1428, et al., the defendants below were: Valeriano Suarez, a physician who practiced at the Central West Medical Center located on the eighth floor of a building at 2400 West Madison, Chicago, Illinois; James McClure, a physician who assisted Dr. Suarez on a part-time basis at the medical center;[3] Clifford T. Green, a pharmacist and part-owner of the Afro-American Pharmacy located across the hall from the medical center and Henry G. Fort, part-owner of the pharmacy and owner of the building.

In June 1973, a grand jury returned a 33 count indictment against the defendants.[4] Count I charged that a conspiracy existed between the defendants to dispense controlled substances pursuant to prescriptions which would be issued without a legitimate medical purpose and to distribute controlled substances pursuant to prescriptions which they knew to be issued neither in the usual course of professional treatment nor for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1) and 21 C.F.R. § 306.04(a).

In addition to the conspiracy count, 27 of the remaining 32 counts are on appeal.[5] Seventeen substantive counts charged Dr. Suarez for knowingly and intentionally dispensing on or about specified dates Schedule II and III controlled substances without a legitimate medical purpose,[6] and ten substantive counts charged Green for knowingly and intentionally distributing on or about specified dates Schedule II controlled substances pursuant to prescriptions which he knew were issued neither in the usual course of professional treatment nor for a legitimate medical purpose.[7] The controlled substances which constitute the basis for the bulk of the charges are: Ritalin, Desbutal, Doriden, and Tuinal.[8] After a jury finding of guilty, Suarez was sentenced to five years, Green to three years and Fort to one year imprisonment. In addition, all were given special parole terms of two years.

Numerous individuals, some of whom were government agents, testified that they would come to the medical clinic, receive minimal, if any, professional

---

scribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances. . . .

3. Dr. McClure was found not guilty by the jury and accordingly is not presently before this court.

4. Originally there had been a 30 count indictment against the four defendants. This was dismissed on the government's own motion and superseded by the present indictment.

5. Count 2 indicted Green for knowingly and intentionally furnishing a material false statement to the Registration Branch of the Bureau of Narcotics and Dangerous Drugs. This count was severed and eventually dismissed by the government after Green's conviction.

Count 9 charged Dr. Suarez with dispensing a Schedule III controlled substance without a legitimate medical purpose. He was found not guilty of this count.

Counts 31–33 indicted Dr. McClure for illegally dispensing Schedule III controlled substances without a legitimate medical purpose. These counts are not before us.

6. Counts 3–8, 10–13, 18, 20, 21, 24–27. All but Counts 5 and 7 alleged dispensing of Schedule II controlled substances.

7. Counts 14–17, 19, 22, 23, 28–30.

8. The government offered the following description for these substances:

RITALIN—a trade name for a tablet containing methylphenidate, a Schedule II controlled substance.

DESBUTAL—a trade name for a capsule containing methamphetamine, also a Schedule II controlled substance.

DORIDEN—a trade name for capsules or tablets containing glutethimide, a Schedule III controlled substance.

TUINAL—a trade name for tablets or capsules containing sodium amobarbital and sodium secobarbital, also a Schedule III controlled substance.

medical treatment and would be given upon request one or more prescriptions, either in their own or a fictitious name, for substances described in the indictment. They would then proceed across the hall and have their prescriptions filled without questioning by defendant Green. Some witnesses testified to coming in once a week under different names and receiving prescriptions on each occasion. This was supported by medical files which contained more than one name on them. There was also evidence that there were names of famous individuals [9] appearing on prescriptions for controlled substances written by Dr. Suarez and filled at the Afro-American Pharmacy. These individuals neither received the controlled substances prescribed nor were medical files containing their names found at the medical center.

Other corroborating evidence of wrongdoing by the defendants included the existence of the no refill for fifteen days rule established by Dr. Suarez. Most patients, who paid $10 per visit, were given prescriptions that would last them fifteen days. Jackie Hunter, receptionist and office manager of the clinic, testified that there were certain preferred patients who did not have to abide by the "fifteen day rule" and who could usually purchase multiple prescriptions. Ms. Hunter also testified that she overheard a conversation where Green was cautioning Dr. Suarez about prescribing too much medication for a particular individual. There was also evidence that a direct telephone line was set up from Dr. Suarez' office to the pharmacy owned by Green and Fort. Ms. Hunter testified that Green and Fort complained that Suarez was not using the telephone often enough to call prescriptions directly in, and that because of this sales were being lost to other pharmacies. Finally, Fort and

Hunter had a guard placed near the pharmacy with directions to prevent individuals from entering the pharmacy unless they had a prescription and with directions to prevent the selling of medication in the lobby.

Defendants Suarez and Green challenge their convictions on the grounds that as individuals subject to registration under the Controlled Substances Act, they are not subject to conviction under 21 U.S.C. § 841(a) which was the basis for the indictment. United States v. Moore, 505 F.2d 426 (D.C.Cir. 1974), cert. granted, 43 U.S.L.W. 3445 (U.S. Feb. 18, 1975). Furthermore, all the defendants argue that the indictment in the present case is dependent on a regulation that was promulgated without authority and that impermissibly expands the range of proscribed activities beyond what the statute itself makes criminal. Finally, defendant Fort raises a sufficiency of the evidence claim.

II

In 74–1468 [10] the defendant is Pay Ming Leu, a physician who practiced medicine on Chicago's west side. Dr. Leu was charged in an indictment returned in April 1974. Counts 1–11 charged that he knowingly and intentionally dispensed Schedule II and III controlled substances pursuant to prescriptions not written in the course of professional practice in violation of 21 U.S.C. § 841(a)(1), and Counts 12–30 charged that he knowingly and intentionally attempted to dispense Schedule II and III controlled substances pursuant to prescriptions not written in the course of professional practice in violation of 21 U.S.C. §§ 841(a)(1), 846. Dr. Leu was found not guilty of Counts 1–11 (dispensing) and guilty of Counts 12–30 (attempting to dispense). He was sentenced to five consecutive one year pris-

---

**9.** Such names as Lana Turner, Mark Twain, Spencer Tracy, Loretta Young, Joan Crawford, Ralph Nader, Karl Malden, Peter Fonda, Peter Lorre, Lena Horne, Carl Stokes, Celeste Holm, Lawrence Welk, Aretha Franklin, Rosaline Russell, and Pablo Casales.

**10.** No. 74–1420 was an appeal from the district judge's denial of bond pending appeal. An emergency motion by the defendant requesting injunctive relief was denied by this court on May 29, 1974.

on terms [11] which are the subject of this appeal.

The primary evidence against Dr. Leu was the testimony of three agents of the Drug Enforcement Administration and one agent from the Illinois Legislative Investigating Commission. These agents each described circumstances in which Dr. Leu sold them prescriptions for controlled substances. Agent Ward testified that he went to Dr. Leu for the first time on April 19, 1973 and asked to buy $100 worth of Ritalin. Dr. Leu said he could only give him a prescription for 90 pills. Five days later Ward asked for, but was refused another prescription for Ritalin because he was "too early," but after asking then instead for Seconal, he was given a prescription for a similar drug called Tuinal. Agent Ward returned thereafter and picked up other prescriptions. At no time was any physical examination given or a medical history taken.

Agent Adams testified that he told Dr. Leu that he was not kicking any habit, but just wanted to buy some Ritalin to get high. Dr. Leu then gave him a prescription for 90 pills in exchange for $20. On his next visit Adams received prescriptions for Ritalin and Seconal.

Agent Doyle went to Dr. Leu in September 1973, and explained that since July, when he had last seen Dr. Leu, he had been in Canada selling Methylphenidate (active ingredient in Ritalin). Dr. Leu wrote a prescription for Desoxyn in the name of Eddie DeGrazia (Doyle's undercover name) and although he would not write one for Ritalin to the same person, he did write one in another name, known by Dr. Leu not to be Doyle's real name. Agent Doyle told Dr. Leu that he never used Ritalin, but he just sold it to which the doctor replied: "Everybody has to make a living."

Shortly thereafter Doyle asked for and received two 90 pill Ritalin prescriptions made out in the names of Ronald Henry and Thomas Sexton. A few days later Doyle purchased two more prescriptions under new names. He was at no time examined by Dr. Leu.

Agent Brown first visited Dr. Leu's office on April 19, 1973 and asked for and received a prescription in the name of Arnie Wilson for Ritalin and Seconal because he was having a party. Two weeks later he bought prescriptions in the name of Eddie Brown. Agent Brown subsequently returned and got prescriptions in the name of Bonnie Hill, Billy Brown, Lenora Brown, Lenora Wilson and Glenn Gray. Brown had told Dr. Leu that he was selling the pills.

Dr. Leu challenges his conviction on the same grounds as the defendant-doctor in 74–1428. In addition, Dr. Leu argues that his conviction should be reversed on the grounds that certain instructions to the jury were erroneous; that the evidence was insufficient to make out an attempt case where the prescriptions were never filled; that certain expert opinion evidence invaded the province of the jury; and that there was excessive pretrial publicity and that the evidence was insufficient to sustain the conviction.

### III

The principal issue raised by the defendant-physicians in both cases is that they are not subject to conviction under 21 U.S.C. § 841(a)(1) because of their status as registrants.[12] The thrust of defendants' argument is premised on Chief Judge Bazelon's decision for a divided court in United States v. Moore, 505 F.2d 426 (D.C.Cir. 1974), cert. granted, 420 U.S. 923, 95 S.Ct. 1116, 43 L.Ed.2d 392 (1975). The court opined that Con-

11. The sentence was subsequently modified because conviction under 21 U.S.C. §§ 841, 846 requires the imposition of a special parole term. This was set at three years.

12. It is not entirely clear from the record whether Green (pharmacist) is a registrant under the act. It would seem that 21 U.S.C.

§ 822 would require him to register in order to be able to lawfully distribute controlled substances. In any case because of our disposition of the Moore case issue, whether Green was registered or not becomes irrelevant.

gress in enacting the Controlled Substances Act was distinguishing between the registrant and non-registrant in determining whether the penalty provisions of 21 U.S.C. §§ 842, 843 were to apply or the more severe sanctions of 21 U.S.C. § 841 were applicable. As the court said:

> In contrast to §§ 842 and 843, § 841 does not mention "registrants" as the focus of any of its provisions. It provides for sentences of up to 15 years and fines of up to $25,000. This broad outline strongly suggests that Congress intended to deal with registrants primarily through a system of administrative controls, relying on modest penalty provisions to enforce those controls, and reserving the severe penalties provided for in § 841 for those seeking to avoid regulation entirely by not registering.

*Moore, supra* at 430.

█ Prior to *Moore* it was unanimously held that physicians who were registrants could be liable under 21 U.S.C. § 841 if they prescribed controlled substances outside the course of professional practice. United States v. Larson, 507 F.2d 385 (9th Cir. 1974); United States v. Badia, 490 F.2d 296 (1st Cir. 1973); United States v. Jobe, 487 F.2d 268 (10th Cir. 1973), cert. denied, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); United States v. Leigh, 487 F.2d 206 (5th Cir. 1973); United States v. Bartee, 479 F.2d 484 (10th Cir. 1973); United States v. Collier, 478 F.2d 268 (5th Cir. 1973).[13] For the following reasons we respectfully decline to follow the majority holding in *Moore* and we find ourselves instead persuaded by Judge MacKinnon's dissent and the earlier precedents.

We agree with the *Moore* majority that Congress in some respects intended to treat physician-registrants differently from non-registrants. We do not agree, however, that registrants were to be totally immune from the sanctions imposed by section 841. Insofar as registrants are guilty of technical violations (e. g., use of oral prescription when written one is required; dispensation of controlled substances for which he is not authorized to another registrant; distribution of controlled substances without the proper label; failure to keep proper records; distribution pursuant to an improper order form; use of improper registration number) in their day-to-day dealings with controlled substances in accordance with their professional responsibilities, they are liable only for the lesser penalties of sections 842 and 843. When, however, a physician acts without any legitimate medical purpose and beyond the course of professional practice by selling prescriptions that allow the bearer to obtain controlled substances, his conduct should be treated like that of any street-corner pill-pusher.

Section 841 makes it "unlawful for *any* person . . . to distribute or dispense controlled substances . . .." That prohibition is absolute unless otherwise "authorized by [the] subchapter." We deem it to be significant that the exception refers only to a distributing or dispensing that is authorized by the subchapter rather than a broader exception which would totally exempt all registrants.[14] Furthermore, the definition of the term dispense requires that a practitioner be involved either in delivering, ordering or prescribing a controlled substance. 21 U.S.C. § 802(10). A practitioner is one registered or one otherwise permitted by the United States or a state to dispense or administer a controlled substance. 21 U.S.C. § 802(20). Thus, it is clear that when 21 U.S.C. § 841(a) refers to "dispense," it can only

---

**13.** The theories for finding physicians liable under 21 U.S.C. § 841 were varied. Thus, in United States v. Leigh, 487 F.2d 206 (5th Cir. 1973), the court held that an indictment charging "distributing" by a physician instead of "dispensing" was invalid, while in United States v. Badia, 490 F.2d 296 (1st Cir. 1973), the court held that a physician was guilty of

"distributing" rather than "dispensing" because as a registrant he could only be "dispensing" if he was in fact acting within the course of professional practice.

**14.** The question of what types of distributions and dispensations are authorized is discussed *infra*.

mean that physicians as well as other practitioners are subject to the sanctions of that section if their actions are not authorized by the subchapter.

There is another example of internal inconsistency that follows from a holding that section 841(a) does not apply to registered physicians. If a registrant distributed a controlled substance without using the proper order form or in any manner that violated 21 U.S.C. § 843 (technical violations including use of fictitious registration number; acquisition of controlled substances through misrepresentation; furnishing false information on documents required to be kept or filed and making of equipment designed to reproduce drug trade names fraudulently) he could receive up to four years imprisonment for an initial violation. A violation of the type charged in these cases, selling of prescriptions without a legitimate medical purpose, would, according to the *Moore* theory, be cognizable only under 21 U.S.C. § 842 (since section 841 would be unavailable and the charge is not covered by section 843). A violation of section 842 carries only a one year imprisonment term for initial violations. This would mean that a physician who knowingly wrote prescriptions to anyone on demand would receive at most a one year sentence, while his colleague who failed to use a proper order form could receive up to four years imprisonment. We do not believe that Congress intended such a result.

Furthermore, our judgment is supported by looking closely at section 842(a)(1), the section *Moore* would rely on for this action in lieu of section 841.

Section 842(a)(1) makes it unlawful for a registrant to dispense a controlled substance in violation of 21 U.S.C. § 829. Section 829 refers to the situations when a physician is required to use either a written or oral prescription, and directs the form that the prescription is to take. It does not specifically deal with the problem of the issuance of prescriptions without any medical justification. The fact that section 842(a)(1) may have been violated by the defendant-physicians [15] does not preclude the possibility that they are liable under another section carrying more severe sanctions.

Finally, the legislative history of the Controlled Substances Act substantiates our position. The present Act replaced the Harrison Narcotics Act of 1914, 38 Stat. 785 (1914), the prohibitions of which (against dispensing narcotics) were applied to registered physicians who acted beyond the course of their professional practice. United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922); Jin Fuey Moy v. United States, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214 (1920); United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493 (1919).

We have neither been directed to nor have we discovered a substantial basis in the legislative history that convinces us that physicians were not to be liable under section 841 as they were under the Harrison Act for dispensing controlled substances outside the course of their professional practice. While it is true to some degree that the Harrison Act was thought inadequate with regard to defining precisely the liability of physicians,[16]

---

**15.** *See Moore, supra,* 505 F.2d at 452 n.10 (MacKinnon, J., dissenting).

**16.** As quoted from the Prettyman Commission of 1963 in the House Report accompanying the Controlled Substances Act:

Since the passage of the Harrison Act of 1914, the Federal narcotics laws have expressly permitted a physician to prescribe narcotic drugs for a patient in the course of "professional practice only" and for "legitimate medical uses" and "legitimate medical purposes." Under this statutory language there is no doubt that a physician may

prescribe narcotic drugs for a patient suffering acute pain or from a painful and incurable disease. But a controversy has existed for 50 years over the extent to which narcotic drugs may be administered to an addict solely because he is an addict.

During the first 10 years following enactment of the Harrison Act, the Supreme Court affirmed several convictions under the act involving the indiscriminate prescribing of narcotic drugs for addicts. In 1925, however, in Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819, the Court indicated that the dispensing of nar-

this goal was accomplished in the Controlled Substances Act through the gradations of sanctions provided by sections 841–843 and by empowering the Attorney General to promulgate regulations to define more precisely what constitutes authorized dispensing. 21 U.S.C. §§ 821, 871(b).[17] It was not accomplished, as the *Moore* court holds, by exempting physicians from the sanctions of section 841.

The language in the legislative history relied on by the *Moore* court to conclude that physicians were not to be included within the coverage of section 841 is in our view too general to justify that conclusion. The congressional purpose behind section 841 was to get the drug dealer no matter who he might be, and to prevent diversion of legitimately produced controlled substances into illicit channels.[18] One of the major sources of this illicit diversion is from registrants who have relatively easy access to controlled substances. Certainly Congress did not intend to immunize such individuals from prosecution under section 841.

We hold that section 841 does not exclude physicians from its coverage.

## IV

It is next necessary to consider precisely what type of dispensing or distributing is authorized by the exception clause of section 841. All the defendants in both consolidated appeals argue that charges against them are based on an invalidly promulgated regulation that expands too broadly the conduct considered impermissible under section 841. The challenged regulation is 21 C.F.R. § 306.04(a) which provides that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice. The phrase "legitimate medical purpose" is not used in section 841(a) but is used in the indictments, and that discrepancy is the basis of the defendants' challenge.

In our view, the challenged regulation has been validly enacted and does

---

cotic drugs by a physician for the purpose of relieving conditions incident to addiction was not in every instance a violation of the act. . . .

The regulations of the Bureau of Narcotics, however, do not seem to be in accord with [Linder]. . . .

The practicing physician has thus been confused as to when he may prescribe narcotic drugs for an addict. Out of a fear of prosecution many physicians refuse to use narcotics in the treatment of addicts except occasionally in a withdrawal regimen lasting no longer than a few weeks. In most instances they shun addicts as patients.

H.R.Rep.No.91–1444, 91st Cong., 2d Sess., U.S.Code Cong. & Admin.News, pp. 4566, 4580 (1970).

17. As stated by the House Report accompanying the Act:

Although the committee is concerned about the appropriateness of having Federal officials determine the appropriate method of the practice of medicine, it is necessary to recognize that for the last 50 years this is precisely what has happened, through criminal prosecution of physicians whose methods of prescribing narcotic drugs have not conformed to the opinions of Federal prosecutors of what constitutes appropriate methods of professional practice. In view of this situation, this section will provide

guidelines, determined by the principal health agency of the Federal Government, after consultation with appropriate national professional organizations. Those physicians who comply with the recommendations made by the Secretary will no longer jeopardize their professional careers by accepting narcotic addicts as patients.

H.R.Rep.No.91–1444, 91st Cong., 2d Sess., U.S.Code Cong. & Admin.News, pp. 4566, 4581 (1970).

18. The House Report accompanying the Act stated:

With regard to the stimulant and depressant drugs, now regulated under the Federal Food, Drug, and Cosmetic Act as amended by the Drug Abuse Control Amendments of 1965 and in 1968, it should be noted that as estimated in a report by this committee in March of 1965 on the Drug Abuse Control Amendments of 1965, almost 50 percent of the 9 billion amphetamines and barbiturates produced legitimately in this country were diverted into illicit channels. As of late 1969, when that diversion figure was rechecked, it was still accurate.

H.R.Rep.No.91–1444, 91st Cong., 2d Sess., U.S.Code Cong. & Admin.News, pp. 4566, 4572 (1970).

not expand the criminal statute. Section 841(a)(1) makes it unlawful to dispense or distribute controlled substances "except as authorized by this subchapter." 21 U.S.C. § 822(b) provides that registrants are allowed to dispense controlled substances "to the extent authorized by their registration and in conformity with the other provisions of this subchapter." Two of the provisions of the subchapter are 21 U.S.C. § 821 and § 871(b). Section 821 provides that "[t]he Attorney General is authorized to promulgate rules and regulations . . . relating to the . . . control of the . . . distribution, and dispensing of controlled substances." Similarly, section 871(b) provides that "[t]he Attorney General may promulgate . . . regulations . . . for the efficient execution of his functions under this subchapter." It is pursuant to that authority that 21 C.F.R. § 306.04(a) was promulgated. Thus, it is clear that the prescriptions involved in the present cases were not effective because they were not issued for a legitimate medical purpose. The exemption from section 841(a) is applicable only if the action of the practitioners is authorized. Since there was no lawful prescription ever written, it follows that section 829 has not been complied with [19] and the dispensing of the controlled substances in these cases has not been authorized. This interpretation does not expand the meaning of section 841(a), but rather seeks to define the exemption clause of that section.[20]

Although it is probably true that more precise regulations are desirable as to what physicians may or may not do with respect to the exception clause of section 841(a), the present cases are not of the border line variety which had in part motivated Congress to abandon the Harrison Act and enact the Controlled Substances Act.[21] In the present cases there were wholesale sales of prescriptions without even the pretense of a legitimate medical purpose or standard medical procedures. Under these circumstances we find no merit in the defendant's claims that the regulation expanded what was criminal beyond the congressional statute.

V

■ The defendant Fort in 74–1435, owner of the building that housed the medical center and the Afro-American Pharmacy, challenges his conviction on sufficiency of the evidence grounds. We have reviewed the evidence and find that in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Esquer, 459 F.2d 431, 433 (7th Cir. 1972), cert. denied, 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973), that a sufficient basis exists in the record upon which the jury could reasonably conclude that the defendant Fort had participated in a conspiracy with Dr. Suarez and Green to violate section 841(a).

While the evidence against Fort is not overwhelming, there was sufficient testimony tying him to the prescription sales operation. He was fully aware of the 15 day rule and its operation. He knew

---

**19.** It is true that section 842 provides penalties for registrants who fail to comply with section 829. This, however, refers to specific technical violations of section 829 and of 21 U.S.C. § 353(b) which is incorporated by reference in section 829. We believe that where a prescription is void, as 21 C.F.R. § 306.04(a) provides, that the appropriate section to be applied is 841.

**20.** Even without reference to the regulation the government has sustained its burden in these cases. Section 841(a) makes it illegal to dispense controlled substances except as authorized. The term dispense is defined so as to include the prescribing of a controlled

substance by a practitioner which is defined to include a registrant (physician or pharmacist) who acts within the course of professional practice. 21 U.S.C. § 802(10), (20). Since the wholesale selling of prescriptions for controlled substances is beyond the scope of professional practice, a physician (or pharmacist who participates in such a scheme) is not acting as a practitioner. Thus, if such an individual's actions are not that of a practitioner they are not authorized under the subchapter and the exception clause of section 841 does not apply.

**21.** See note 17, supra.

that there were exceptions to the rule and that one of these exceptions was Lorenzo Bliss, whom Fort knew personally. Furthermore, Fort not only knew of the direct telephone link-up between the medical clinic and pharmacy, but he expressed disappointment that Dr. Suarez was not making greater use of the line in order that clinic patients would be forced to come to Fort's pharmacy. In addition, Helen Basie testified that to her comment that there were too many people in the clinic and that it could not be possible for that many people to be coming to see this doctor with the same illness and getting the same medication, Fort replied, "Yes, he's getting out of hand."

Other evidence pointing to Fort's involvement in the conspiracy included the fact that Fort had hired security guards for the first and eighth floors. The guards were instructed to make sure that patients did not sell medication in the building. In addition, it was shown that the pharmacy had bought over 1,000,000 Ritalin tablets in an eleven month period, and that on occasion Fort ordered and picked up these supplies. From all this evidence the jury could reasonably conclude that Fort was not a passive part-owner of a pharmacy involved in illegal distribution of controlled substances, but that he knew of and was involved in a concerted effort to violate section 841(a).

22. The instruction given read:

Federal law authorizes a licensed physician to prescribe controlled substances of the kinds charged in the indictment, if the drug is prescribed in the course of the physician's professional practice.

The defendant Pay Ming Leu is a licensed physician. It is therefore a defense to the charges in this indictment that the controlled substances were prescribed by him in the course of his professional practice.

A controlled substance is prescribed by a physician in the course of his professional practice, and therefore lawfully, if the substance is prescribed by him in good faith in medically treating a patient.

In order to determine whether or not a prescription or prescriptions were issued in the course of a defendant physician's professional practice, you may consider all of

## VI

The defendant Dr. Leu in addition to the challenges already considered and rejected raises a number of other claims.

### A

The defendant contends that the jury instruction on what constituted a defense by a physician to an action under section 841(a) should have been broader than "if the substance is prescribed by him in good faith in medically treating a patient."[22] Initially, the defendant asked for an instruction that would have established a defense on the mere showing that a controlled substance was prescribed by a physician for his patient's own use.

As the district judge correctly observed, the defendant's proffered instruction was too broad and would have taken the heart out of the government's case. The defendant's instruction would have had the effect of applying the *Moore* rationale. We have decided that a prescription issued by a physician that is so far removed from a physician's professional responsibilities (i. e. more than mere technical violations of his authorization) violates section 841(a). The "good faith medical treatment" instruction seems to be an accurate reflection of this holding and in no way was prejudicial to the defendant's case.[23]

the evidence of circumstances surrounding the prescribing of the substance in question, the statements of the parties to the prescription transaction, any expert testimony as to what is the usual course of medical practice, and any other competent evidence bearing on the purpose for which the substances in question were prescribed.

Unless you find beyond a reasonable doubt that an act of prescribing charged in the indictment against a physician defendant was not done by the defendant physician in the course of his professional practice, then you should find him not guilty.

23. The defendant also objects to an instruction given by the district judge that defined not only Schedule II and III controlled substances (the basis of the indictment) but also Schedule I substances (not involved in the indictment). The purpose of giving the defi-

## B

Defendant Leu was found not guilty of eleven substantive counts, but found guilty of the remaining counts all charging him with attempt to dispense. It is uncontroverted that the prescriptions written by the defendant that form the basis for Counts 12–30 were never filled. Even assuming that a prescription must be filled to complete the crime of dispensing a controlled substance as defined by section 841(a), it seems to us clear that a prescription need not be filled to make out a case of attempting to dispense against a physician.

We have previously determined that a physician's authorization which gives rise to an exemption from section 841(a) liability, does not cover the writing of prescriptions outside the course of one's professional practice. In the present case the proof shows that the defendant wrote and sold prescriptions to individuals outside the scope of his professional duties. When this occurred the defendant-physician had completed all the elements of the offense that he would ever commit and that were within his control. As far as Dr. Leu was concerned, the crime had been completed. If for some reason it was not in actuality completed, it was because of "factual" and not "legal" impossibility, and therefore not a sufficient defense to an attempt charge. United States v. Heng Awkak Roman, 356 F.Supp. 434 (S.D.N.Y.), aff'd, 484 F.2d 1271 (2d Cir. 1973), cert. denied, 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974). This is not a case of "mere preparation" but rather one of attempt to commit the crime of dispensing. Here we have "the commission of an overt act, the 'doing something directly moving toward, and bringing him nearer, the crime he intends to commit.'" United States v. Noreikis, 481 F.2d 1177, 1181 (7th Cir. 1973). As the court said in United States v. Mandujano, 499 F.2d 370 (5th Cir. 1974):

> First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting. . . .
>
> Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.

*Id.* at 376.

The foregoing test was clearly met in this case.[24]

## C

The defendant complains that the expert testimony of Dr. Howard D. Kurland as to customary procedures followed by licensed medical physicians in treating a new patient prior to prescribing a controlled substance as medication invaded the province of the jury.

While it may be true that an expert should not be allowed to express a conclusion upon the ultimate issue of fact to be decided by the jury, United

nition of a Schedule I substance (high potential for abuse and no currently accepted medical use) was because the definition of Schedule I is referred to in the definition of Schedule III. It is clear that the defendant was not prejudiced by this instruction. The instruction as given was an accurate statement of the law as set out in 21 U.S.C. § 812 and the judge not only informed the jury why he was reading them the definition of Schedule I substances, but also advised them that this case involved no such substances.

24. As an offshoot to this argument the defendant argues that since the jury found him not guilty of Counts 1–11, and that at least some of the elements involved in these acquittals were involved in the remaining attempt counts, that the verdicts are inconsistent. Merely because inconsistent verdicts are rendered does not necessarily require a reversal. United States v. Greene, 497 F.2d 1068 (7th Cir. 1974). In this case, however, the verdicts are not inconsistent. The attempt counts charge the defendant Leu with selling of prescriptions on entirely different occasions than do the first eleven substantive counts. Furthermore, as compared to the first eleven counts the proof on the attempt counts showed more dramatically that no legitimate medical purpose was involved (i. e. more frequent intervals and wholesale use of fictitious names).

States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (1935), the testimony of Dr. Kurland in the present case was entirely proper. Here Dr. Kurland merely testified as to what customary medical procedure was generally followed before the prescribing of drugs. He did not comment on whether the procedures followed by the defendant were appropriate, given the individual nature of his patients' conditions. That question was properly left for the jury's determination. Testimony as to the traditional procedures and techniques to be followed by a physician in a given set of circumstances is entirely permissible by a witness who is qualified as an expert in the medical field. United States v. Bartee, 479 F.2d 484, 488 (10th Cir. 1973); Heller v. United States, 104 F.2d 446, 449 (4th Cir. 1939).

In addition, the trial judge gave La-Buy instruction 6.16–1 which advised the jury that an expert's opinion need not be accepted by them. We conclude, therefore, that the defendant has shown no prejudice caused by the admission of Dr. Kurland's testimony.

### D

■ Dr. Leu further contends that he was denied a fair trial because of adverse pre-trial publicity. The defendant claims that news stories reporting his indictment and the trial of Dr. Suarez served to prejudice him. We note that most of the stories complained of were published or broadcast five months before defendant's trial, and accounts of Dr. Suarez' trial were published approximately six weeks before the start of Dr. Leu's trial.[25] At the voir dire it was established that the jurors had never heard of Dr. Leu or anything about this case. In addition, at the close of the evidence the jury was instructed to consider only the evidence presented in the courtroom and to disregard any press, television or radio reports they might

have seen or heard. Considering the specific facts of this case, the intensity of the exposure and the nature of the publicity, we conclude that the publicity attendant with this trial was minimal and clearly does not warrant either a reversal or remand. United States v. Barrett, 505 F.2d 1091, 1100 (7th Cir. 1974), petition for cert. filed, 43 U.S.L.W. 3438 (U.S. Feb. 11, 1975).

### E

■ Finally, we have examined defendant Leu's sufficiency of the evidence argument and we find it without merit. As the facts summarized in part II, *supra,* indicate, there was clearly a sufficient basis to support the jury's verdict.

We have examined all of the defendant's other contentions of error and find them unpersuasive.

For the foregoing reasons the judgments of the district court in both cases are affirmed.

---

**25.** The fact that Dr. Suarez was sentenced during the trial of Dr. Leu does not establish substantial prejudice. Indeed, except for the bald assertion that the Suarez sentencing co-

incided with the Leu trial, the court's attention is not directed to any specific articles or broadcasts that contain anything more than a bare reporting of the facts.